IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

In re                                                                Case No. 25-20897-MCR

OB LLC                                                               Chapter 11

    Debtor.

_____/

**OBJECTION TO CLAIM OF DEMOCRACY CAPITAL CORPORATION**

Comes now OB LLC ("OB" or the "Debtor"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 3007 and Local Rule 3007-1, and objects to the claim, CR #1 (the "Claim"), of Democracy Capital Corporation ("DCC"), and in support of said objection states as follows:

    **I.**    **Introduction**

The Debtor owes a significant amount of money to DCC, with the correlative obligation being secured by the lien of DCC on OB's real estate holding (the "Property")—this is not in dispute. The precise sum of that obligation, however, is very much contested for two separate-yet-related reasons: (i) a plain assessment of the loan history—applying relevant interest rates, borrower payments, and lender advances—fetches a total debt nearly $800,000.00 less than that set forth in the Claim; and (ii) under governing law, DCC is estopped from herein seeking a sum of money greater than (a) that previously indicated to be the debt due and owing, plus (b) intervening interest (including default interest) at the contract rate, plus (c) intervening lender advances (if any).

The latter point underlies the strangely schizophrenic nature of the Claim: DCC has, on various previous occasions, offered ever-changing—and facially-inconsistent—payoff numbers to OB, with at least *some* of the figures being seemingly less tied to the laws of mathematics than

1

to perceived opportunism. There is a troubling appearance that DCC has altered the payoff figure on the underlying loan, from time to time, in an effort to either (i) extract a greater sum upon sale of the Property; or (ii) frustrate a sale of the Property so DCC might bid-in the asset at foreclosure and profit—directly or through an insider—from the development thereof.

If DCC is to be made to honor the first relevant payoff figure (upon which OB has detrimentally relied in marketing the Property), the Claim should be fixed at $2.7 million as of August 29, 2023 and adjusted to $3,061,333.00 (adding non-default interest *and* default interest between August 29, 2023 and the petition date).[1]

If, conversely, DCC is not to be made to honor its prior payoff figure, and OB's reliance thereupon is to be disregarded, the Claim should be fixed at $3,148,248.15 as of the petition date. This is the figure fetched through the simple application of historic payments and advancements, alongside the accrual of interest (including default interest and late fees, which OB does *not* dispute existing).

Under either scenario, however, the Claim should not be in the amount of $3,917,945.54—the figure appearing on the face of the Claim.

## II.     Relevant Facts

1.     OB borrowed $2,500,000.00 from American Bank on October 19, 2011, with the loan being funded on October 21, 2011 and being evidenced by a promissory note (the "Note"). *See* Exhibit A to Claim, CR #1-3.

---

[1] As noted *infra*, OB does not believe DCC is entitled to this additional interest, insofar as DCC's actions directly frustrated OB's ability to pay the debt when a sale of the Property was set to close several months later. OB may either amend this objection, or bring a freestanding adversary proceeding, to seek recovery or setoff of this after-accrued interest.

2. The Note was amended through change in terms agreements on three subsequent occasions, with the most notable impacts of said agreements being to (i) alter the interest rate on the Note; and (ii) extend the maturity date of the Note. *Id.*

3. While the Note provides for a variable interest rate, the floor rate established therein—six percent (6%) per annum—controlled at all times until the subject rate was lowered (first by a reduction of the floor rate and then, later, by conversion to a fixed rate) to five percent (5%) per annum, commencing September 1, 2014. *Id.*[2]

4. Various payments were made over time, with certain late fees accruing and the holder of the Note making certain advances for the preservation of the property (ie, tax payments).

5. In or about 2016, Congressional Bank succeeded to the majority—but not the whole—of the assets of American Bank, with various unacquired assets being spun into DCC.

6. A loan payment history, through February 16, 2016, from Congressional Bank (which inherited the records of American Bank), is attached hereto as Exhibit A.

7. It is not believed that a regulated financial institution has maintained a loan payment history, for the Note, at any time since February 2016.

8. On August 25, 2023, Erik Bolog ("Mr. Bolog"), a manager of OB, send a text message to JR Schuble ("Mr. Schuble"), the chairman of DCC, asking for a loan payoff for the Note. *See* Text Message Thread, attached hereto as Exhibit B.

9. Mr. Schuble responded that he asked "Doug", the comptroller of DCC, to have the payoff sum calculated. *Id.*

---

[2] Pragmatically, this means the interest rate was six percent (6%) per annum until September 1, 2014 and then five percent (5%) per annum at all times thereafter; while there is some complexity in calculating the variable rate, said calculations ultimately invite the conclusion that the floor rate always controlled over the lower, variable number.

10. Mr. Schuble subsequently indicated that "Doug" asked "Amanda" to calculate the payoff, indicating "Amanda" to be DCC's controller. *Id.*

11. Mr. Schuble then indicated, four days after receiving the request, that the payoff is "Approx 2.7." *Id.*

12. Mr. Bolog proceeded to rely on this figure, in negotiating a sale of the Property, so as to allow the equity interest of OB to receive sufficient monies—after retirement of debt and payment of closing costs—as to minimize the financial loss occasioned by investment in the Property.

13. OB had made over $1.6 million in payments on the Note prior to August 2023, and had an obvious interest in staunching the ongoing losses associated with ownership of the Property by recovering, at sale, as much of these monies as reasonably practicable.

14. The Property then proceeded to go under contract and, in July 2024, on the eve of closing, DCC transmitted a payoff figure of $3,480,235.06, frustrating OB's ability to close on the contemplated sale.

15. Subsequently, in November 2025, DCC commenced foreclosure proceedings, alleging the sum due and owing to be closer to $3.85 million.

16. However, on November 13, 2025—just days before this case was filed—the president of DCC produced yet another payoff statement, showing the debt due and owing to be $3,448,989.67. *See* Loan History, attached hereto as Exhibit C.

17. Six days later, OB petitioned for chapter 11 relief, *see* Voluntary Petition for Non-Individuals Filing for Bankruptcy, DE #1, with DCC then proceeding to docket the Claim, in the amount of $3,917,945.54, scantly three weeks post-petition, *see* Claim, CR #1.

18. Using the best available information from the foregoing documents (interest rates from loan documents, payment histories from loan records, and lender advances from loan records), and applying applicable laws of mathematics, the sum due and owing to DCC—if the $2.7 million payoff figure from August 2023 is not found to be binding or give rise to a claim of equitable estoppel—on the petition date, was $3,148,248.15. *See* Debtor Calculations, attached hereto as Exhibit D.

### III.  Standard

Familiarly, Title 11 of the United States Code (the "Bankruptcy Code") provides creditors may file proofs of claim. 11 U.S.C. § 501(a). Any party in interest is then permitted to docket an objection thereto. 11 U.S.C. § 502(a). As this Honorable Court has previously observed:

> If an objection is filed, section 502(b) of the Code requires the Court to determine the amount of the claim and to disallow the claim under certain circumstances, including to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured. . . "

*Chroba v. Quantum3 Grp. LLC (In re Chorba)*, 582 B.R. 380, 384 (Bankr. D. Md. 2018) (quoting 11 U.S.C. § 502(b)(1)).

### IV.  Argument: The Claim is Significantly Overstated

As noted *supra*, there are two possibilities: First, that the $2.7 million payoff from August 2023 is to be afforded preclusive effect, in which case the Claim should be in the amount of $3,061,333.00 ($2,700,000.00 on August 29, 2023 plus five percent (5%) interest per annum, plus an additional three percent (3%) default interest per annum).[3] Or, second, that the debt should be calculated without regard to the $2.7 million payoff, in which case the Debtor believes the

---

[3] As noted *supra*, *see* n. 1, OB actually believes the flow of interest should have legally stopped when DCC then frustrated a closing by transmitting an inflated payoff figure. This issue will be further addressed through either an objection amendment or an adversary proceeding, however.

worksheet attached hereto as Exhibit D correctly shows a gross obligation, as of the petition date, of $3,148,248.15. Under either scenario, the Claim is significantly inflated in its present form.

### a. The Payoff Calculation

Insofar as the Claim does not append an interest worksheet, or otherwise breakdown how the obligation has been calculated—aside from a broad, macro-characterization set forth in a rider—it is difficult to ascertain where DCC's numbers vary from those set forth on Exhibit D to this objection. And it will thusly be incumbent upon DCC, in opposing this objection (should DCC elect to do so), to produce an interest and payment worksheet (or records from which such may be derived) showing where its numbers diverge from those of the Debtor and from the payoff numbers provided by DCC's president, attached as Exhibit C.[4]

The Debtor's calculations are based on the data readily extractable from the loan documents (namely the principal sum loaned, the relevant interest rates, the relevant late fees, and the relevant maturity date), being mindful of the change in terms agreements and the temporal impact of each such change in terms. The Debtor's calculations are also based on the payment histories previously furnished by Congressional Bank and DCC itself.

The Debtor's calculations do differ from the loan histories in one important fashion, though: the Debtor's calculations do not begin to assess default interest until April 2018—when the loan matured and when there was a default in the form of a failure to pay at maturity. For

---

[4] By way of necessary disclosure: DCC has, through counsel, produced documentation pursuant to Federal Rule of Evidence 408, in furtherance of settlement communications. OB is absolutely not going to attach, quote from, or otherwise rely on that documentation, in this objection, for myriad self-evident reasons. However, to the extent this objection may be read as feigning naivete as to where the parties' calculations differ, such is unintended and would be misleading: the Debtor appreciates DCC's willingness to provide documentation through discussions with the Subchapter V trustee and appreciates the good faith with which DCC's counsel has engaged in discussions with the Debtor's counsel.

reasons OB genuinely does not understand, DCC appears to have commenced charging default interest nearly two years earlier, in May 2016. OB never received a default notice and, more importantly, cannot decipher—from the face of the loan documents—what default DCC could allege to have been extant in May 2016.

If, however, a default is credited as having occurred in May 2016 and having given rise to the charging of default interest at all times thereafter, the calculation would only shift by $116,500.00, bringing the total due—on the petition date—to $3,264,748.15. *See* Alternate Loan Calculation (assuming default interest from May 2016), attached hereto as Exhibit E.

### b. Estoppel

Lest the foregoing discussion of $116,500.00 in mysterious default interest appear piddling, the number is actually of some secondary import: if that sum is disregarded, the loan balance, in August 2023, would have been $2,724,627.41: a number that is "Approx 2.7." *See, supra,* § II, ¶ 11. Such a figure would, in turn, mean Mr. Schuble's text message—relaying information from DCC's own controller—was neither error nor folly but, rather, an accurate assessment of the then-current debt owed by OB. This matters for two reasons: first, such shows the reasonableness of OB's reliance on the payoff figure, which was not absurd or clearly errant; and, second, this suggests the payoff figure was accurate.

Yet even if, *arguendo*, that was not the true payoff sum on the date DCC's chairman informed OB of such, DCC is still estopped from asserting a different payoff sum (as of that date) in this bankruptcy proceeding. As observed by the Supreme Court of Maryland (née Court of Appeals):

> . . . equitable estoppel requires that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party sought to be estopped. Although wrongful or unconscionable conduct is generally an element of estoppel,

> an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other.

*Knill v. Knill*, 510 A.2d 546, 549-50 (Md. 1986) (citing *Dahl v. Brunswick Corp.*, 356 A.2d 221, 230-31 (Md. 1976); *Savonis v. Burke*, 216 A.2d 521, 523 (Md. 1966); *Bean v. Steuart Petroleum*, 224 A.2d 295 (Md. 1966); *Travelers v. Nationwide*, 224 A.2d 285 (Md. 1966); *Alvey v. Alvey*, 155 A.2d 491 (Md. 1959).

Here, the evidence will ultimately show that the market for the Property is remarkably niche in nature—undeveloped lots of land, with restrictive residential zoning, do not sell with the same ease, or to the same broad consuming public, as the homes ultimately built thereupon. There was—and remains—but a single logical purchaser for the Property. And Mr. Bolog relied on DCC's assertion of a $2.7 million payoff in commencing negotiations with that purchaser, essentially setting the context for what closing price would ultimately be arrived upon.

OB was willing to sell the Property for a sum of money that would come close to restoring equity to being whole (albeit not quite making equity fully whole). OB arrived upon an appropriate figure based on DCC's assertion of the debt—calculated by DCC's own controller, and relayed by DCC's own chairman—in August 2023. And DCC is accordingly equitably estopped, under Maryland law, from now claiming the debt, on that date, to have been any different.

Again, this may well be a largely-academic point: as noted *passim*, it appears the debt, in August 2023, actually *was* just over $2.7 million. But to the extent DCC now wishes to go back and manufacture a different theory of late fees and default interest, and to otherwise urge the numbers should be read differently, DCC is nonetheless estopped from so doing.

V.     **Argument: DCC Cannot Charge a Default Penalty at Maturity**

Finally, a somewhat esoteric—though potentially quite important—point: DCC is not entitled to charge a late fee for the missed maturity payment. The rider to the Claim suggests DCC

8

to be seeking $260,519.35 in late fees. *See* CR #1-2, p. 2. This number is significantly greater than the sum found on the Debtor's worksheets. And the delta appears to be a five percent (5%) charge of the full unpaid principal ($2,000,000.00), on the maturity date. The Debtor is not including this charge for the simple reason that this charge is not permitted under the loan documents.

The Note provides: "If a payment is 15 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $2.00, whichever is greater." *See* Note at p. 1. Regular interest payments, made on a monthly basis, are "regularly scheduled payment[s]." A payment of a loan's balance, at maturity, is not something that is *regularly* scheduled—such a payment is an event scheduled but once and an extraordinary (i.e., *irregular*) event at that.

Indeed, the Note is at-best ambiguous as to whether or not a late fee applies to the repayment of principal at maturity. Such an ambiguity, if even extant, is to be construed against the interests of the lender (the party that caused the Note to be drafted). *Cf. Collier v. MD-Individual Practice Ass'n*, 607 A.2d 537, 539 (Md. 1992).

A plain reading of the Note would not invite the inference that a massive late fee—of $100,000.00—was going to be assessed if the loan was not repaid at maturity. To the contrary, the Note gives rise to the inference that a failure to repay at maturity will cause default interest (an added three percent (3%)) to commence accruing—a harsh penalty unto itself. And in the face of case law that insists ambiguities be construed against drafting parties, it is difficult to see how a different, palpably harsher reading of the Note could be permitted *sub judice*.

### VI.  Conclusion

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) sustain this objection; (ii) find the claim of DCC, as of the petition date, to be for $3,085,960.74, with

interesting accruing thereupon post-petition; and (iii) afford such other and further relief as may be just and proper.

                                                        Respectfully submitted,

Dated: January 14, 2026      By:    /s/ Maurice B. VerStandig
                                                Maurice B. VerStandig, Esq.
                                                Bar No. MD18071
                                                The VerStandig Law Firm, LLC
                                                9812 Falls Road, #114-160
                                                Potomac, Maryland 20854
                                                Phone: (301) 444-4600
                                                mac@mbvesq.com
                                                *Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of January 2026, a copy of the foregoing was served electronically upon filing via the ECF system on all counsel who have entered an appearance herein, including:

- James Taylor Heidelbach    jheid@gebsmith.com
- Nicole C. Kenworthy    bdept@mrrlaw.net
- Keith M. Lusby    klusby@gebsmith.com
- Stephen A. Metz    smetz@offitkurman.com, MD71@ecfcbis.com;lydia.yale@offitkurman.com
- L. Jeanette Rice    Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- US Trustee - Greenbelt    USTPRegion04.GB.ECF@USDOJ.GOV
- Maurice Belmont VerStandig    mac@mbvesq.com, lisa@mbvesq.com;mahlon@dcbankruptcy.com;mac@dcbankruptcy.com;verstandig.mauricer104982@notify.bestcase.com;verstandiglaw@recap.email

                                                        /s/ Maurice B. VerStandig
                                                        Maurice B. VerStandig, Esq.