**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | |
|---|---|
| In re | Case No.  25-20897 |
| OB LLC, | Chapter 11 |
| Debtor. | |

## RESPONSE TO OBJECTION TO CLAIM OF DEMOCRACY CAPITAL CORPORATION

Democracy Capital Corporation opposes the Objection to Claim filed by the Debtor, OB, LLC [ECF No. 64] ("Claim Objection"), and states as follows:

### INTRODUCTION

The Claim Objection raises two primary challenges to Democracy's proof of claim. First, the Debtor contends that Democracy has not correctly calculated the amount owed to it. Democracy's calculations reflect a balance of $3,899,071.16 as of the Petition Date.  The Debtor contends, however, that the appropriate calculation is $3,148,248.15.  Second, the Debtor argues that Democracy should be estopped from asserting a balance higher than the approximate figure relayed in an informal text message by one of Democracy's principals years ago. Neither argument withstands scrutiny.

The Debtor's calculation of the loan balance is flawed in several fundamental respects. The Debtor ignores that it committed multiple events of default under the Loan Documents dating back to November of 2012 — nearly six years before the final maturity date — and on that basis excludes years of default interest to which Democracy is contractually entitled. The Debtor further fails to account for late charges on the unpaid matured balance of the Loan.  Additionally, while the Debtor acknowledges that Democracy made protective advances, it treats those advances as simple expense items rather than interest-bearing additions to the indebtedness as the Loan

Documents expressly require. And the Debtor's calculation includes no attorneys' fees or expenses whatsoever, despite the Loan Documents' unambiguous fee-shifting provision. These omissions, taken together, account for the substantial difference between the parties' figures.

The Debtor's estoppel defense fares no better. To prevail, the Debtor must establish that it reasonably relied on Democracy's representation to its detriment. It cannot satisfy either element. The text message at issue — in which Democracy's principal relayed that the loan balance was "Approx 2.7" — was qualified on its face as an estimate, and settled law holds that reliance on a communication known to be an estimate is not reasonable. And, even if reliance had been reasonable (it was not), the Debtor suffered no cognizable detriment. The Debtor claims it priced the sale of its real property based on the approximate figure, but it never closed at that price. By the time the property was sold in this very proceeding, at a higher price, the Debtor had long since received the accurate payoff figure from Democracy. A party that ultimately closes a transaction at a higher price than originally contemplated, and does so with full knowledge of the accurate payoff figure, cannot claim detrimental reliance on an earlier informal estimate.

Accordingly, the Claim Objection has no merit and should be overruled.

## FACTUAL BACKGROUND

**A.**     **The Loan and the Loan Documents.**

The Debtor is indebted to Democracy in connection with a $2.5 million commercial loan originally extended by American Bank[1] to the Debtor ("Loan").

---

[1] American Bank subsequently merged into Congressional Bank and Congressional Bank is now known as Forbright Bank.  For simplicity, the defined term "American Bank" as used herein refers to American Bank, together with its successor-by-merger, Congressional Bank, which is now known as Forbright Bank.

The Loan is evidenced by a $2,500,000 Promissory Note, dated October 19, 2011, executed and delivered by the Debtor to the order of American Bank ("Original Note"). A copy of the Original Note is attached hereto as Exhibit 1.  The Original Note was modified by several Change In Terms Agreements dated as of April 19, 2013 ("CIT 1"), dated as of April 19, 2011 ("CIT 2"), and dated April 19, 2015 ("CIT 3" and collectively with CIT 1 and CIT 2, the "CIT Agreements"), attached hereto as Exhibit 2 through 4, respectively.  The Original Note, as modified by the CIT Agreements, are referred to herein collectively as the "Note."

The Loan is secured by, among other things, a duly-perfected, first-priority lien in, to, and against the real property commonly known as 8800 Grandhaven Avenue, Upper Marlboro, Maryland 20772 ("Property") and the proceeds thereof, pursuant to that certain Purchase Money Deed of Trust, dated October 19, 2011 executed by the Debtor to the Trustees named therein for the benefit of American Bank and recorded among the Land Records of Prince George's County, Maryland in Liber 33058, Folio 291 ("Deed of Trust").  A true and accurate copy of the Deed of Trust is attached hereto as Exhibit 5.  The Original Note, the CIT Agreements, the Deed of Trust, and all other documents evidencing or securing repayment of the Loan are referred to collectively herein as the "Loan Documents."

Democracy is the successor-in-interest to American Bank with respect to the Loan and the current holder and owner of the Loan Documents.  A true and accurate copy of a Confirmatory Assignment of Deed of Trust, dated August 5, 2025, recorded among the Land Records at Liber 51215, Folio 78 (collectively, the "Assignment"), evidencing the assignment of the Deed of Trust to Democracy, is attached hereto as Exhibit 6.

**B.      The various Events of Default under the Loan Documents.**

The Debtor has repeatedly failed to meet its obligations under the terms and conditions of the Loan Documents, resulting in several different Events of Default (as defined in the Loan Documents), including without limitation:

- **Monthly Payment Defaults:**  The Note required the Debtor to make interest only payments on the first of each month and the loan history appended to the Claim Objection reflects that payments were not timely made as early as November 2012 and continued to be late regularly thereafter. *See* Ex. 1 at p.1 ("Payment").  Payments were consistently missed entirely starting in early 2016 and ceased entirely in 2018. Each late and missed payment constitutes a separate Event of Default. *See* Ex. 5 at p.2.

- **Failure to Pay Taxes:** The Debtor failed to pay real estate taxes as early as 2013, causing the lender to make a protective advance in the amount of $24,413.45.  The Debtor regularly failed to pay real estate taxes thereafter.  The failure to pay the taxes is an Event of Default.  *See* Ex. 5 at p.2. As evidenced by both the Debtor's and Democracy's spreadsheets (Ex. 7), Democracy repeatedly had to make protective advances to satisfy property taxes.

- **The Debtor's Maturity Defaults:**  The Original Note matured on April 19, 2013, but was extended to April 19, 2014 pursuant to CIT 1. The Loan was not paid on the April 19, 2014 maturity date. Although the maturity date was later extended to April 19, 2015 pursuant to CIT 2, that extension required payment of $250,000 "with the extension." See Ex. 3. That payment was not made until well after April 19, 2014, and therefore the extension did not take effect until after the Loan had already matured. The Loan

later matured again in April 2018 (as extended by CIT 3), but it likewise was not paid at that time.

- **Additional Collateral:** Pursuant to CIT 2 and as a condition to the extension of the maturity date described therein, the Debtor was required to establish a real estate tax reserve of at least $50,000 and the individual guarantor of the Loan was required to pledge his interest in an investment property located as 5226 Pooks Hill Road in Bethesda, Maryland. The Debtor did not maintain that reserve and the guarantor sold that property notwithstanding the pledge to the lender.

## C.    After maturity, the Debtor effectively abandoned the Property.

After the Loan matured on April 19, 2018 pursuant to CIT 3, the Debtor effectively abandoned the Property. The Debtor made no payments to Democracy, did not satisfy the taxes due and owing, and carried no insurance. Ultimately, it was Democracy protecting the Property by making protective advances to cover the tax obligations.

## D.    The alleged facts giving rise to an estoppel claim.

In the Claim Objection, the Debtor alleges that it has an estoppel defense based on the facts set forth below. In so reciting them, Democracy does not concede that they are true or correct, but merely presents them as a narrative to contextualize its arguments.

In August 2023, the Debtor's Manager, Erik Bolog, sent a text message to JR Schuble, one of Democracy's principals, inquiring about a payoff figure for the Loan. Mr. Schuble responded a few days later by stating only "Approx 2.7." The Debtor claims that Mr. Bolog relied on this figure to negotiate a sale of the Property at a price that would allow the Debtor to recoup significant equity from the sale proceeds, after retirement of the debt and payment of closing costs. Although

the Claim Objection is silent on the specific transaction, Democracy understands the Debtor to be referring to a Contract of Sale with Werrlein Properties Limited Liability Company (the "Purchaser") for a purchase price of $3,500,000.

The Debtor alleges that it attempted to close on the Property nearly a year later, in July of 2024, at which point it received an official payoff statement from Democracy reflecting a balance of approximately $3,480,000. The Debtor contends that the higher-than-expected payoff figure frustrated its ability to close the sale and caused it financial harm.

The Debtor never suffered the harm it claims to have suffered. The Debtor did not consummate the sale of the Property to the Purchaser for $3.5 million. Instead, as the Court is well aware, it obtained an increase in the purchase price and the sale closed to the Purchaser for the sum of $4 million.

**E.      The Debtor files the instant case to stay Democracy's foreclosure sale.**

As a result of the numerous events of default more particularly described above, Democracy commenced an action to foreclose its lien against the Property. On the date of the scheduled sale, November 19, 2025 (the "Petition Date"), the Debtor filed the instant Subchapter V case. Because Democracy had taken the Property all the way up to a foreclosure sale, it necessarily incurred attorneys' fees and expenses pursuing its rights and remedies under the Loan Documents.

**F.      The Debtor sells the Property for $4 million to the Purchaser.**

The Debtor thereafter obtained authority to sell the Property under Section 363 of the Bankruptcy Code, as well as its Second Amended Plan of Reorganization, and this Court's Confirmation Order (collectively, the "Sale Authorizing Documents"). Pursuant to the Sale

6

Authorizing Documents: (a) net proceeds of $3.5 million were paid to Democracy to reduce the balance of the Loan; and (b) the balance of proceeds (comprising approximately $500,000.00) are being held in escrow pending resolution of this Claim Objection.

Democracy filed its Proof of Claim [Claim No. 1], asserting a claim in the amount of $3,917,945.54 as of December 15, 2025. An Excel spreadsheet reflecting the calculation of the amounts owed as of the Petition Date is attached hereto as Exhibit 7.[2] As noted therein, Democracy's claim as of the Petition Date was $3,899,071.16.

## LAW AND ARGUMENT

**A.     Democracy's claim calculation is correct.**

While the Debtor's calculation and Democracy's calculation differ substantially, those differences are driven primarily by four factors: (i) despite defaults existing as early as 2012, the Debtor does not start charging default interest until 2018 when the Loan matured for the final time; (ii) the Debtor fails to account for late charges for payments the Debtor failed to make at maturity; (iii) the Debtor does not factor in all of the protective advances made by Democracy and fails to accrue interest on such advances; and (iv) the Debtor does not include any attorneys' fees and expenses incurred by Democracy.

---

[2] Democracy has uploaded a .pdf version of the spreadsheet via CM/ECF. A "native" version of the spreadsheet has been made available to the Court and all counsel of record to aid in the resolution of this Claim Objection. The spreadsheet appended as Exhibit 7 is substantially the same spreadsheet that was used to calculate Democracy's claim set forth in its Proof of Claim and which was previously shared by the undersigned with counsel for the Debtor and the Subchapter V Trustee. The one deviation is that, in preparing this response, Democracy discovered that the late charges at maturity had been inadvertently and erroneously placed in the wrong row. They now correctly appear on May 1, 2014 (after the April 19, 2014 maturity date) and May 1, 2018 (after the April 19, 2018 maturity date).

**1.      The Debtor first defaulted on the Loan in 2012, giving rise to the imposition of Default Interest.**

As noted above, throughout the life of the Loan, the Debtor failed to timely make its monthly payments. These payments were often late, with the first identified late payment occurring in November of 2012.

Pursuant to the clear and unambiguous terms of the Loan Documents, the failure to tender the monthly interest payment on November 1, 2012 is an "Event of Default." Ex. 1 at 1 ("Payment Default"). Upon the occurrence of such default, "the interest rate on th[e] Note shall be increased by adding an additional 3.000 percentage points margin." *Id.* ("Interest After Default"). Democracy's calculation does just that – from the date of the first default, Democracy increases the applicable rate of interest by an additional three (3) percentage points as contemplated by the Loan Documents. Notably, the Loan Documents contain no provision permitting the default interest rate to reset to the contract rate, and no subsequent agreement between the parties waived Democracy's right to impose it.

In the Claim Objection, the Debtor claims it cannot discern what default would have occurred prior to maturity.[3] But, the Debtor's defaults are apparent from the very exhibit attached to the Claim Objection. The pay history reflects a number of late payments, as detailed above. The Debtor also asserts it never received any notice of default. But this is immaterial. The Loan Documents do not require any formal written notice of payment defaults nor do they require notice

---

[3] The Debtor presents an alternative calculation where default interest accrues from 2016. It is unclear why the Debtor is using 2016 as the start date. Democracy's calculation has always charged default interest commencing in 2012 when the first default is reflected on the pay history.

prior to imposing default interest.  To the contrary, default interest gets imposed automatically upon the occurrence of any "Event of Default."[4]

In sum, the first default occurred in 2012.  A myriad of defaults occurred thereafter. The Loan Documents make it clear that, upon any such default, the interest rate is automatically increased by three (3) percentage points.  The Debtor's calculation fails to account for this additional interest.

   2.      **Democracy is entitled to charge late charges on unpaid matured balance of the Loan.**

The Debtor's calculations fail to reflect any late charge on the matured balance of the Loan. As noted above, the Loan matured twice without payment: namely, the April 19, 2014 maturity date and the April 19, 2018 maturity date.

The Debtor argues in its Claim Objection that no late charge is owed on the matured balance. But this argument finds no support in the terms of the Loan Documents. The Note explicitly provides that "[i]f a payment is 15 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $2.00, whichever is greater."  Ex. 1 at 1 ("Late Charge"). The Debtor clings to the words "regularly scheduled" to argue that the fee applies only to periodic

---

[4] Whether American Bank imposed the default rate at the time of default is irrelevant to the calculation of the claim.  The Note specifically provides that, "***Lender may delay or forego enforcing any of its rights or remedies under this Note without losing them***."  Note at 2 ("General Provisions") (emphasis added).  Courts have upheld the application of this exact language to permit a lender to impose default interest at a later date. *See, e.g.*, *Beverly Bank & Trust Co., N.A. v. Standard Bank & Trust Co.*, 2013 IL App (1st) 122716-U, 2013 WL 5614439 (Ill. App. Ct. Oct. 10, 2013) (applying identical contractual language and holding that lender's failure to collect default interest rate following borrower's default did not constitute waiver where promissory note expressly provided that lender may delay or forego enforcing any of its rights or remedies without losing them).

monthly interest payments and not to full payment due at maturity. But there is no basis in the Note for such a reading.

The matured principal balance was unquestionably a "payment" due under the Note. Indeed, it was the most significant payment obligation the Debtor undertook. The Note's payment schedule required full satisfaction of all outstanding principal and accrued interest at maturity. The payment at maturity is a "scheduled payment." The late charge provision applies to any payment that is 15 days or more late; it does not distinguish between monthly payments and balloon or maturity payments, and the Court should not read in a distinction the parties did not negotiate. *See, e.g.*, *Schroeder v. Manceri*, 893 So. 2d 603 (Fla. 4th DCA 2005) (charging a 5% late charge on principal balloon payment when late charge was applicable to any overdue payment); *1300 Ave. P Realty Corp. v. Stratigakis*, 186 Misc. 2d 745, 748, 720 N.Y.S.2d 725 (App. Term 2d Dep't 2000) (holding that late charge provision applying to "any payment required pursuant to the terms hereof" captured the final balloon payment, and rejecting as "strained" the mortgagor's argument that the late charge applied only to periodic installment payments exclusive of the balloon).[5]

When the Loan matured in April 2014[6] and was not paid, Democracy was entitled to assess a late charge. That late charge was never waived by any subsequent Loan Document or other agreement. The maturity date of the Loan was thereafter extended to April 2018, at which time the

---

[5] The obvious distinction the Note was making is to differentiate between scheduled payments and other charges that might arise under the Loan Documents. For example, if the Lender had charged a fee for a dishonored check, the late charge would not apply. Such a charge would not be a regularly scheduled payment.

[6] As noted above, although maturity was subsequently extended to April 19, 2015, it required payment of a principal curtailment as a condition to such extension. That condition was not satisfied until well after April 19, 2014.

Loan again matured and was not paid. Accordingly, Democracy is entitled to assess a late charge on the matured balance as of that date as well. Both of these charges are absent from the Debtor's calculation.[7]

### 3. The Debtor fails to account for all protective advances and does not charge interest on protective advances as required by the Loan Documents.

The Debtor's calculation ignores several protective advances made by Democracy to satisfy unpaid taxes on the Property. It is missing the protective advances made by Democracy for taxes owed in 2024 and 2025 in the aggregate amount of $55,500.68. *See* Exhibit 8 (receipts of tax payments).

More fundamentally, however, the Debtor's calculation treats the advances like expense items that simply get added to the balance of the Loan. However, pursuant to the terms of the Deed of Trust, these amounts are to become part of the indebtedness and accrue interest at the rates set forth in the Loan Documents:

> **Lender's Expenditures.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to

---

[7] Democracy has taken a conservative approach with respect to late charges. As reflected in the CIT Agreements, the maturity date was extended three times, and Democracy was entitled to assess a late charge each time the Loan matured and was not paid. Although the maturity dates were later extended, the CIT Agreements appear to have been executed after the relevant maturity dates and thus functionally "backdated," meaning the Loan had already matured and gone unpaid at the time of each extension, with no subsequent waiver of the applicable late charge. Nevertheless, Democracy has assessed only two maturity late charges, as noted above. Democracy also notes there were other means by which it could have presented a more aggressive calculation in good faith. For example, at the time the Debtor made a $250,000 payment, it was in default and Democracy could have applied such amounts to reduce interest instead of as a principal curtailment. Democracy, however, has applied it as a straight reduction to principal. Given that Democracy was forced to step in and protect and preserve the Property after the Debtor abandoned it, and has already taken a conservative approach in calculating the amounts due, there is no equitable basis to further reduce amounts that Democracy is otherwise entitled to recover under the Loan Documents.

11

comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts required to be discharged or pay under this Deed of Trust or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, **including but not limited to discharging or paying all taxes**, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. **All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness** and, at Lender's option, will (A) be payable on demand; or (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

Ex. 5 (Deed of Trust) at p.2.

Democracy's spreadsheet appropriately adds the protective advances to the principal balance of the Loan and accrues interest at the applicable contract rates. The Debtor's spreadsheet, however, fails to account for any interest accrual on these protective advances.

### 4.      The Debtor fails to include any attorneys' fees and expenses.

The Debtor's calculation includes no attorneys' fees or expenses.  But, when the Debtor filed its case, Democracy had already incurred substantial fees and expenses in the amount of $29,296.26,[8] seeking to collect the balance of the Loan.  Specifically, Democracy had almost

---

[8] The amount of fees reflected in the Proof of Claim was $37,697.76 because the proof of claim was filed as of December 15, 2025.  The fees as of the Petition Date are provided to facilitate a comparison between the Debtor's calculation and Democracy's.  Because Democracy is oversecured, it is entitled to recover its post-petition attorneys' fees and expenses.  Democracy will file an Application for such fees and expenses pursuant to Section 506(b) of the Bankruptcy Code.  These amounts must also be included in Democracy's claim.

12

completed a foreclosure of the Property, and thus had all the attendant costs and expenses of a foreclosure sale (legal fees, auctioneer costs, advertising costs, etc.). Democracy is entitled to recover these attorneys' fees and expenses. *See* Ex. 1 at 1 (Attorneys' Fees and Expenses).

**B.     The Debtor's Equitable Estoppel Defense Fails As A Matter of Law.**

The Debtor contends that Democracy should be equitably estopped from asserting the full amount of its claim based on the August 2023 text message in which Mr. Schuble indicated, in an informal text message, that the balance of the Loan was "Approx 2.7." Of note, the balance of the Loan at the regular rate of interest, excluding default interest and other charges, was approximately $2,700,000 at that time.

The elements of equitable estoppel in Maryland are well settled. For the Debtor to prevail on such a defense, it must prove that: (1) Democracy made a voluntary representation or engaged in conduct upon which the Debtor relied; (2) the Debtor's reliance on that representation was reasonable; and (3) the Debtor suffered actual injury or detriment as a direct result of that reliance. *Knill v. Knill*, 306 Md. 527, 534-35, 510 A.2d 546, 549-50 (1986); *Rubinstein v. Jefferson Nat'l Life Ins. Co.*, 268 Md. 388, 393, 302 A.2d 49, 51 (1973). The Debtor's estoppel argument fails because it will be unable to prove reasonable reliance or actual detriment.

      **1.     Any reliance on Mr. Schuble's stated estimate was not reasonable.**

           **a.     As a matter of law, reliance on estimates is not reasonable.**

As a threshold matter, the requirement of reasonable reliance is not satisfied where the communication on which the party claims to have relied was qualified on its face as an estimate rather than a definitive commitment. *Intermountain Bldg. & Loan Ass'n v. Casper Mut. Bldg. &*

13

*Loan Ass'n*, 46 Wyo. 394, 28 P.2d 103, 104 (1934) (citing *Hammerslough v. Ass'n*, 79 Mo. 80, and 21 C.J. 1142).

The *Intermountain Building* case is instructive on this point. There, a purchaser of mortgaged property who purchased the property subject to the loan received both an oral statement and a written document showing a specific dollar figure representing the estimated amount due on a loan, and made payments accordingly. When the lender subsequently demanded a larger sum before releasing the mortgage, the purchaser argued estoppel. The Wyoming Supreme Court rejected the defense, holding that because the purchaser knew at the time he received the figures that they were estimates only, the lender was not estopped from asserting the true amount due. *Id.* In so holding, the Court emphasized that, when a person understands a statement to be an opinion or estimate, reliance on such a statement is not reasonable. *See also Livick v. The Gillette Co.*, 524 F.3d 24, 31-32 (1st Cir. 2008) (pension plan participant did not have an estoppel claim based on pension benefit calculations provided by employer because estimates given to him were plainly estimates).[9]

Maryland courts have reached the same result in the context of evaluating a negligent misrepresentation claim where reasonable reliance is also a critical element. *See Goldstein v. Miles*, 159 Md. App. 403, 436, 859 A.2d 313, 332 (2004) ("A statement that is 'vague and indefinite in its nature and terms . . . is not sufficient to support' either a fraud or negligent

---

[9] There are numerous other examples of courts refusing to accept estoppel defenses based on estimates. *See also, e.g., Burns v. Marley Co. Pension Plan*, 663 F. Supp. 2d 135, 142 (E.D.N.Y. 2009) (a benefit statement explicitly labeled as an estimate will not constitute a misrepresentation because reliance on such a statement is not reasonable as a matter of law); *Perreca v. Gluck*, 295 F.3d 215, 225-26 (2d Cir. 2002) (where a routine statement contains disclaimers that calculations are estimates subject to review, the statement does not constitute a promise and reliance on it is not reasonable).

14

misrepresentation action, because 'such indefinite representations ought to put the person to whom they are made, upon the inquiry, and if he chooses to put faith in such statements, and abstained from inquiry, he has no reason to complain.'" (internal citations omitted)).

This same principle bars the Debtor's estoppel defense here. As the attachments to the Debtor's Claim Objection make plain, Mr. Schuble's statement was intended as nothing more than an estimate. He described the debt as "Approx 2.7" and did not purport to provide a definitive payoff figure. Under the principles articulated above, any reliance on such a representation was unreasonable as a matter of law.

### b.    The Debtor's sophistication precludes a finding of reasonable reliance.

Even setting aside the face of the communication itself, the Debtor cannot establish reasonable reliance for an independent reason: Mr. Bolog, the Debtor's manager and recipient of the communication, is both a former bank general counsel and a commercial lawyer who knew exactly what a formal payoff statement looks like and chose not to request one until a year after that text message was sent.

In assessing whether reliance was reasonable, courts look to the background, experience, and sophistication of the party claiming to have relied upon the representation at issue. In the lending context, Maryland courts have recognized that a borrower's sophistication bears directly on whether reliance on a lender's representation was reasonable as a matter of law. In *Parker v. Columbia Bank*, 91 Md. App. 346, 362, 604 A.2d 521, 529 (1992), borrowers alleged that their bank had represented that draws on a construction loan would be issued only after confirming that work was completed in accordance with the draw schedule, and that the bank would protect their interests throughout construction. The Court of Special Appeals noted that a commercial

15

borrower's reliance on such representations "might well be unreasonable as a matter of law" because a sophisticated commercial borrower should understand that construction loan draw provisions are designed to protect the lender, not the borrower. *Id.* at 529.

The same principle applies with equal force to sophisticated professionals who claim to have relied on informal representations in their own area of expertise. In *Goldstein v. Miles*, 159 Md. App. 403, 437, 859 A.2d 313, 332 (2004), the Court of Special Appeals held that experienced attorneys could not establish reasonable reliance on vague oral representations concerning the future sale of a law firm, reasoning that it was "not just unreasonable, but inconceivable" that sophisticated lawyers would rely on such assurances. *Id.* Sophistication was not merely a factor to be weighed; it was a basis for defeating reasonable reliance as a matter of law.[10]

This is precisely the result this Court should reach. Mr. Bolog's dual background makes the case twice over. Mr. Bolog is a former shareholder and General Counsel of American Bank. He is the sophisticated commercial borrower *Parker* contemplated and the sophisticated professional *Goldstein* contemplated. He plainly understood that an informal estimate by text message is not a formal payoff statement and any alleged reliance on the same was unreasonable.

---

[10] *See also G&M Oil Co. v. Glenfed Fin. Corp.*, 782 F. Supp. 1085, 1091 (D. Md. 1991) (granting summary judgment against promissory estoppel claim where plaintiff was "an experienced sophisticated business" represented by counsel, reasoning that "sophisticated business entities don't enter into multimillion dollar transactions without a comprehensive writing"); *200 N. Gilmor, LLC v. Capital One, Nat'l Ass'n*, 863 F. Supp. 2d 480, 491 (D. Md. 2012) (recognizing that a sophisticated business entity's reliance on an oral promise may be unreasonable as a matter of law).

16

**2.      There was no detrimental reliance.**

Even if the Debtor reasonably relied on Mr. Schuble's informal text message (it did not), the Debtor's reliance did not cause any detriment.

The Debtor's entire theory is that it received the informal payoff figure and then calculated the purchase price for the Property based on the quoted figure so that the Debtor could recoup its investment in the Property. Stated another way, the Debtor alleges it formulated the $3.5 million purchase price based on the informal estimate provided by Mr. Schuble.

Even assuming *arguendo* this is the case,[11] the Debtor's argument fails because it did not close at $3.5 million.  To establish detrimental reliance, the Debtor must demonstrate that it actually changed its position for the worse in reliance on Democracy's communication. *Knill v. Knill*, 306 Md. 527, 535, 510 A.2d 546, 550 (1986); *Rubinstein v. Jefferson Nat'l Life Ins. Co.*, 268 Md. 388, 393, 302 A.2d 49, 51 (1973). The Debtor cannot do so.

The sequence of events defeats the Debtor's theory entirely. The Debtor sought a payoff figure and received Democracy's informal estimate of "Approx 2.7." The Debtor then purportedly negotiated a sale contract at $3,500,000.  On the eve of closing, Democracy provided the accurate payoff figure. Rather than close at $3,500,000, the Debtor chose not to proceed. At no point did the Debtor part with money, surrender a right, or take an irreversible step in reliance on the

---

[11] Democracy is skeptical of this claim, and it will be the subject of discovery before trial in this matter.  Among other things, this bankruptcy is the first time the Debtor ever asserted that the updated payoff figure prevented the sale.  Presumably, if this was the case, the Debtor would have made a bigger issue about it at or near the first proposed closing. Alternatively, given that even the updated payoff figure was less than the purchase price, the Debtor could have proceeded to closing and contested the amount of Democracy's payoff thereafter.

"Approx 2.7" figure. To the contrary, the Debtor received the correct figure before closing and elected not to proceed. There was no harm.

Ultimately, the contract was amended to increase the purchase price to $4,000,000 and closed at such price. At the time the Debtor closed at $4,000,000, it had long since received the accurate payoff figure from Democracy. Whatever reliance the Debtor claims to have placed on the "Approx 2.7" figure was therefore fully superseded before any transaction was consummated. The Debtor made its ultimate decision to close at a higher price with its eyes wide open as to Democracy's position on the amount of its claim. Any claim of detriment flowing from the "Approx 2.7" figure was extinguished the moment the Debtor chose to proceed with the transaction at $4,000,000 after receiving the correct payoff information.[12]

---

[12] The Debtor references a payoff statement of $3,448,989.67 received just prior to the foreclosure sale, but does not rely on it to support its estoppel defense. As a factual matter: (a) the figure was provided by Mr. Jim Plack, a Democracy shareholder but not an authorized officer; (b) the Debtor requested the spreadsheet not as a formal payoff statement but specifically to understand how Democracy was applying its calculations to the claim — Mr. Plack provided an older version of the spreadsheet for that limited purpose, and it did not purport to be a payoff; and (c) the Debtor knew the actual payoff exceeded this amount because Democracy filed a Statement of Debt in the foreclosure action, as required by Maryland law, reflecting a balance of approximately $3.789 million. A copy of the Statement of Debt is attached as Exhibit 9.

**CONCLUSION**

For all of the foregoing reasons, the Claim Objection should be overruled.

Respectfully submitted,

*/s/ Keith M. Lusby*
James T. Heidelbach (Bar No. 07715)
Keith M. Lusby (Bar No. 05596)
Gebhardt and Smith LLP
One South Street, Suite 2200
Baltimore, Maryland 21202
(410) 385-5028
klusby@gebsmith.com

*Counsel to Democracy Capital Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of March, 2026, I electronically filed the foregoing *Response* via CM/ECF, which will send notice of the filing to the following counsel of record:

Justin Philip Fasano jfasano@mhlawyers.com,
jfasano@ecf.courtdrive.com,
tmackey@mhlawyers.com,
mevans@mhlawyers.com,
cmartin@mhlawyers.com,
Fasano.JustinR92003@notify.bestcase.com

Kevin R. Feig kfeig@mhlawyers.com,
kfeig@ecf.courtdrive.com,
jnesse@mhlawyers.com,
cmartin@mhlawyers.com

James Taylor Heidelbach jheid@gebsmith.com

Nicole C. Kenworthy bdept@mrrlaw.net

Keith M. Lusby klusby@gebsmith.com

Stephen A. Metz smetz@offitkurman.com,
MD71@ecfcbis.com,
lydia.yale@offitkurman.com

L. Jeanette Rice Jeanette.Rice@usdoj.gov,
USTPRegion04.GB.ECF@USDOJ.GOV

US Trustee - Greenbelt USTPRegion04.GB.ECF@USDOJ.GOV

Maurice Belmont VerStandig mac@mbvesq.com,
lisa@mbvesq.com,
mahlon@dcbankruptcy.com,
mac@dcbankruptcy.com,
verstandig.mauricer104982@notify.bestcase.com,
verstandiglaw@recap.email

/s/ Keith M. Lusby
Keith M. Lusby