UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| In re | Case No.  25-20897 |
| OB LLC, | |
| Debtor. | Chapter 11 |

### PRE-TRIAL BRIEF

Pursuant to this Court's Scheduling Order[1] regarding the Debtor's, OB, LLC's *Objection to Claim* [ECF No. 64], Democracy Capital Corporation submits its *Pre-Trial Brief.*

#### I.
#### INTRODUCTION AND BACKGROUND

This dispute arises out of a $2.5 million commercial loan originally extended by American Bank to the Debtor and subsequently acquired by Democracy ("Loan").  Democracy filed a Proof of Claim in connection with the Loan [Claim No. 1].  The Debtor objected to the claim [ECF No. 64] (the "Claim Objection") and Democracy filed a response [ECF No. 76] ("Objection Response"). As described in the Objection Response, there are two primary disputes: (a) the proper calculation of the amounts owed under the terms and conditions of the various documents evidencing, securing or otherwise relating to repayment of the Loan ("Loan Documents"); and (b) whether Democracy is equitably estopped from asserting a balance greater than an estimate informally provided in a text message by JR Schuble, one of Democracy's officers.

Since pleading on the Claim Objection concluded, the parties have engaged in discovery that bears directly on both disputes and, in several material respects, undermines the factual premises underlying the Claim Objection. The legal and factual arguments presented in the

---

[1] ECF No.67, as modified by the Order entered on June 4, 2026 (ECF No. 89).

Objection Response remain fully applicable and need not be repeated here. This Pre-Trial Brief instead supplements those arguments by addressing the evidence developed in discovery that Democracy expects to present at trial.

The discovery record establishes three points that frame the issues for trial.

*First*, discovery disproves the chronology underlying the Debtor's reliance theory. The Debtor alleges that it used Mr. Schuble's "Approx. $2.7 million" estimate (the "Text Message") to formulate and negotiate the $3.5 million purchase price for the sale of its sole asset, the real property located at 8800 Grandhaven Avenue, Upper Marlboro, Maryland 20772 ("Property"). Contemporaneous communications establish, however, that the Debtor and the purchaser, Werrlien Properties Limited Liability Company ("Purchaser"), had already negotiated that price, substantially agreed upon the other material terms, and exchanged a draft purchase agreement before Mr. Bolog requested the estimate from Mr. Schuble.

*Second,* the Debtor's deposition testimony confirms the absence of detrimental reliance. According to the Debtor, its goal was to minimize the losses of its equity investor, who had invested approximately $1 million into the Property, and that $3.5 million was the highest purchase price it could negotiate. Thus, even accepting the Debtor's testimony that it relied on the estimate (it did not), the estimated Loan balance did not cause the Debtor to accept a lower price, reject a better offer, or forgo a more favorable transaction. The Debtor pursued the highest price available regardless of the amount owed under the Loan.

*Third,* discovery confirms the factual predicates underlying Democracy's calculation. The Debtor attached the Congressional Bank loan history to the Claim Objection and subsequently confirmed, in discovery responses and deposition testimony, that the payment history is accurate.

That undisputed history establishes the defaults and late payments that trigger default interest and other charges under the Loan Documents. Democracy's calculation applies those contractual consequences to the payment history the Debtor has admitted is correct. The Debtor's competing calculation is lower only because it disregards those consequences.

The Claim Objection should be overruled.

**II.**
**LAW AND ARGUMENT**

A.    **The Debtor's Estoppel Argument Is Without Merit.**

1.    **There Was No Reliance On The Text Message.**

The centerpiece of the Debtor's estoppel argument is that it relied on the Text Message to formulate and negotiate a $3.5 million purchase price with the Purchaser. The Debtor advanced that premise throughout the Claim Objection and has continued to maintain it in testimony during these bankruptcy proceedings. *See, e.g.,* Claim Objection ¶ 12 ("Mr. Bolog proceeded to rely on this figure, in negotiating a sale of the Property"); *id*. at 9 ("OB arrived upon an appropriate figure based on DCC's assertion of the debt"); *id*. ("Mr. Bolog relied on DCC's assertion of a $2.7 million payoff in commencing negotiations with that purchaser, essentially setting the context for what closing price would ultimately be arrived upon"). The picture painted by the Debtor is straightforward: it first received the estimate and then used that estimate to negotiate the purchase price.

But the written communications between the Debtor and the Purchaser establish precisely the opposite sequence.  Mr. Bolog texted Mr. Schuble on August 25, 2023 requesting the amounts

3

owed under the Loan.  *See* Exhibit 7.[2]    Mr. Schuble responded on August 29, 2023 with the estimated balance of "approx. 2.7."  *Id.*  By this time, however, the Debtor had already reached an agreement in principle on the purchase price and other material terms of the transaction.

Exhibit 9 contains text messages exchanged between Mr. Bolog and Karl Granzow, a representative of the Purchaser. On August 22, 2023, Mr. Granzow offered $3 million, with a $300,000 deposit and a twelve-month closing period. Mr. Bolog countered that same day at $3.5 million, with a $350,000 deposit, a six-month closing, and paid extension rights. The parties then negotiated the remaining study-period term, with the Purchaser responding: "If we can do 2 months study, we have a deal," and Mr. Bolog recommending 45 days. *Id.* The transaction immediately proceeded to documentation. Mr. Granzow transmitted a draft purchase agreement on August 23, 2023, and the parties ultimately executed an agreement incorporating substantially the same purchase price, deposit, and extension rights proposed in Mr. Bolog's counteroffer. *See* Exhibits 11 and 12.   Before Mr. Bolog even requested the Loan balance from Mr. Schuble, the parties had agreed upon the purchase price, substantially negotiated the material terms, and begun documenting the transaction.

Stated simply, the Debtor's story simply does not hold water.  The Debtor could not have relied on the Text Message to its detriment in negotiating the purchase price because the purchase price had been negotiated before the Text Message was sent.  For this reason alone, the estoppel argument fails.

---

[2] Numbered exhibit references are to the trial exhibits submitted contemporaneously with this pre-trial brief.

4

### 2. The Debtor's New Story Is Not Credible.

When confronted with this chronology during the deposition of its corporate designee, Mr. Bolog, the Debtor's story shifted. For the first time in this case, Mr. Bolog claimed that Mr. Schuble had verbally provided an estimate of the Loan balance before the August 22 negotiations and that the subsequent Text Message merely confirmed the earlier oral estimate. *See* Exhibit 21 at Tr. p. 46, lines 11-25; p. 47, lines 1-24. Mr. Schuble denies any such conversation and Mr. Bolog's testimony in this regard is not credible.[3]

First, the alleged oral estimate appears nowhere in the Claim Objection. The Claim Objection repeatedly and expressly identifies the Text Message as the representation upon which the Debtor relied. See Claim Objection ¶ 12 and at 8–9. It never alleges that Mr. Schuble previously supplied the same estimate during a telephone conversation, much less that the Debtor relied upon such a conversation to formulate the purchase price.

Second, the alleged conversation was not disclosed in the Debtor's interrogatory responses. Interrogatory No. 5 required the Debtor to "[i]dentify all communications concerning the amount due and owing under the Loan, including any payoff figure, balance, or estimate thereof." *See* Exhibit 20 at Interrogatory No. 5. The Debtor did not identify any oral communication of any kind.

---

[3] Mr. Bolog's testimony concerning his own relationship to and authority over the Debtor has likewise been inconsistent. Mr. Bolog executed the Purchase Agreement as the Debtor's "Managing Member," while the Debtor's verified interrogatory answers identify Dr. Offen as the managing member and Mr. Bolog merely as an agent. *See* Ex. 20 at Interrogatory No. 14. Mr. Bolog nevertheless testified that he served as an "administrative member," while also maintaining that he was never a member of the Debtor. *See* Exhibit 21, Bolog Dep. Tr. p. 16, lines 19-25; p. 17, lines 6-12. A draft written consent produced in discovery identifies Mr. Bolog as both a member and the managing member. *See* Ex. 10. These inconsistencies are not themselves dispositive of the Claim Objection, but they bear upon the credibility of Mr. Bolog's late-emerging and uncorroborated recollection of an oral estimate.

5

The omission is even more significant in light of the Debtor's responses to Interrogatory Nos. 8 and 16. Interrogatory No. 8 required the Debtor to "[d]escribe in detail how the Debtor calculated the $3,500,000.00 purchase price for the Proposed Sale." *Id*. at Interrogatory No. 8. In response, the Debtor asserted that it first relied upon the $2.7 million figure provided in the Text Message, added a desired $800,000 return, and "then used this desired return to negotiate the sales price with the purchaser." *Id*. Yet the Debtor did not identify any preceding oral estimate or telephone conversation. In both its pleading and its verified discovery responses, the Debtor affirmatively attributed its alleged reliance to the Text Message, not to an earlier oral communication.

Third, the Text Message thread itself contradicts the existence of a prior estimate. After Mr. Bolog requested the Loan balance on August 25, Mr. Schuble advised that he had asked DCC's personnel to calculate the amount. *See* Exhibit 7. Mr. Schuble then reported that the calculation had been referred to DCC's controller and, only after that process, responded on August 29 that the balance was "Approx 2.7." *Id.* That sequence is inconsistent with Mr. Bolog's newly asserted claim that Mr. Schuble had already calculated and communicated the same estimate before the August 22 negotiations.

Mr. Bolog's testimony concerning an earlier oral estimate should therefore be rejected. That testimony emerged only after contemporaneous written communications disproved the chronology alleged in the Claim Objection. It is absent from the Debtor's pleading, omitted from its sworn responses to interrogatories specifically directed to the relevant communications and the basis for its reliance, and inconsistent with the Text Message thread itself. The alleged

6

conversation is not a clarification of the Debtor's original account; it is a new account necessitated by evidence showing that the original one cannot be true.

> **3.     There Was No Detrimental Reliance.**

The chronology forecloses any finding that the Debtor relied on the Text Message in negotiating the purchase price. Even putting the chronology aside, however, the Debtor cannot establish detrimental reliance. Equitable estoppel requires "voluntary conduct or representation, reliance, and detriment." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 310 (2007). The party asserting estoppel must have relied on the representation and "changed his position for the worse." *Knill v. Knill*, 306 Md. 527, 534 (1986).

The Debtor's present theory is that Mr. Bolog relied on the $2.7 million estimate in seeking a price that would minimize the losses of OB, LLC's sole member, Dr. Louis Offen. See Claim Objection at 9 (asserting that OB sought a price that would "come close to restoring equity to being whole"). Mr. Bolog testified that Dr. Offen had invested approximately $1 million, primarily through debt-service payments, and that $3.5 million was the best price the Debtor could obtain. *See* Exhibit 21 at Tr. p. 33, lines, 6-15; p. 41, lines 17-19.

That testimony establishes that the Debtor sought to maximize the sale price so that Dr. Offen could recover as much of his investment as possible. The Loan balance may have affected the recovery the Debtor anticipated, but it did not affect the price available from the Purchaser. The Debtor has identified no lower price it accepted, higher offer it rejected, or negotiating position it changed because of the Text Message.

The circumstances surrounding the scheduled closing likewise reveal no detrimental change in position. The Purchaser remained willing to proceed and exercised a paid extension,

increasing the purchase price from $3.5 million to $3.55 million. *See* Exhibit 14. Although the transaction did not close as scheduled, the Debtor neither lost the Purchaser nor incurred liability to it. Mr. Bolog confirmed that the Purchaser never asserted a claim or commenced litigation arising from the failure to close. *See* Exhibit 21 at Tr. p. 59, lines 10-22.

The eventual sale confirms that the Debtor did not sacrifice a transaction or market opportunity in reliance on the estimate. After this case was filed, and with full knowledge of Democracy's asserted claim, the Debtor sold the Property to the same Purchaser at a higher price. *See* Exhibit 21 at Tr. p. 60, lines 6-11. Moreover, the Debtor has consistently maintained that the Property is a unique asset, that there was only one logical purchaser, and that the Purchaser's familiarity with the Property made it unlikely that further marketing would produce a better price. *See* Claim Objection at 9; Exhibit 19 Motion to Sell Real Property. By the Debtor's own account, therefore, there was no better transaction or market opportunity for it to surrender in reliance on the Text Message.

The record therefore permits no finding of detrimental reliance. The Text Message did not cause the Debtor to alter its negotiations, accept a lower price, lose the Purchaser, surrender another opportunity, incur liability, or otherwise change its position for the worse. The reality is that the Debtor sought the highest available price for the Property, and the Purchaser offered that price regardless of the outstanding Loan balance.

**4.      Any Reliance Was Unreasonable.**

As explained in the Objection Response, no reasonable borrower could treat the Text Message as a formal or binding payoff. It stated only "Approx 2.7" and included no effective date, per diem, itemization, payment instructions, or representation that Democracy would accept that

amount in full satisfaction of the Loan.  As a matter of law, such qualified estimates do not give rise to reasonable reliance.

Discovery confirms that Mr. Bolog, a former attorney and banker, understood the distinction. As the transaction approached closing, he expressly requested "the payoff for OB, LLC," and Mr. Schuble instructed him to provide the title company's contact information so that someone could "calculate and send" it. *See* Exhibit 11. Mr. Bolog thus understood that a formal payoff required a calculation for the anticipated closing and delivery to the title company, neither of which occurred in connection with the Text Message.

**B.      The Undisputed Payment History Supports Democracy's Claim Calculation.**

**1.      The Material Inputs To The Claim Objection Are Undisputed.**

Discovery has eliminated any factual dispute concerning the inputs necessary to calculate Democracy's claim. The Debtor attached Congressional Bank's Loan history to the Claim Objection and has now confirmed that the payment dates and amounts reflected in that history are accurate. When asked to identify every inaccurate payment date, the Debtor identified none; it noted only that the Loan history did not include the payment later made through the Debtor's confirmed plan. *See* Ex. 20 at Interrogatory No. 20. Mr. Bolog likewise confirmed the accuracy of the Loan history during his deposition. *See* Ex. 21 at Tr. p. 68, lines 3-23.

This is significant because it establishes the following: (a) there was a payment default in 2012, entitling Democracy to assess default interest from and after such date; and (b) the $250,000 payment was not made prior to the first loan maturity, giving rise to a late a charge at the time of first maturity.   These facts materially swing the calculation in Democracy's favor for the reasons set forth in its Objection Response.

**2.      Democracy Did Not Waive Its Right to Enforce the Loan Documents.**

The Debtor's discovery responses confirm that its calculation depends substantially upon an assertion of waiver. The Debtor contends that late payments historically were accepted without acceleration and that "no default was ever declared."  Exhibit 20 at Interrogatory Nos. 21 and 22. Those assertions do not establish a waiver of Democracy's right to assess default interest or otherwise enforce the Loan Documents.

As explained in the Objection Response, the Note expressly provides that the "Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them." *See* Ex. 1 at Pg. 3, "General Provisions." The Deed of Trust is even more explicit. It provides that no waiver is effective unless made in writing and signed by the lender; that no delay or omission in exercising a right operates as a waiver; that a waiver on one occasion does not waive the right to demand strict compliance thereafter; and that no prior waiver or course of dealing waives the lender's rights in future transactions. *See* Ex. 2 at pg. 6, "No Waiver by Lender."

The lender's acceptance of late payments therefore did not alter the definition of an Event of Default or waive the contractual consequences of those defaults. An Event of Default arose when the Debtor failed to make a payment when due. The Loan Documents permitted the lender to delay exercising those remedies without relinquishing them. The Debtor has identified no written agreement waiving default interest, amending the definition of an Event of Default, or permanently excusing timely payment.  As a result, Democracy is entitled to charge default interest late charges, and other amounts called for by the Loan Documents as set forth in its calculation of the claim.

**3.      The Debtor Cannot Manufacture Inconsistency from Informal Estimates.**

The Claim Objection attempts to portray Democracy's calculation of the Loan balance as an ever-moving target. To do so, the Debtor conflates informal estimates and working spreadsheets with the formal calculations approved by Democracy for use in a closing, foreclosure, or bankruptcy proceeding. Once that distinction is recognized, the alleged inconsistencies disappear.

The Debtor places particular emphasis on a spreadsheet provided by Jim Plack shortly before the bankruptcy filing that reflected a balance of $3,448,989.67. *See* Claim Objection ¶ 16; Claim Objection Ex. C.  Mr. Plack is a Democracy shareholder and the managing member of South River Capital, LLC, a contractor that provides consulting services to Democracy. He is not, and has never been, Democracy's President or any other officer, nor is he authorized to calculate, approve, or issue payoff statements on Democracy's behalf. That authority rests with JR Schuble, Democracy's longtime President and Chairman. The circumstances under which Mr. Plack prepared the spreadsheet confirm that it was not a formal payoff.

Mr. Plack is expected to testify that Mr. Bolog asked Mr. Plack only for "an idea" of the amount outstanding under the Loan. Neither Mr. Plack nor South River had access to Democracy's financial records, and Mr. Plack did not undertake a new investigation or complete calculation of the amounts due under the Loan Documents. Instead, a South River credit analyst updated a 2019 estimated balance calculation already in South River's files through November 13, 2025. The resulting estimate omitted all late charges, accrued interest, and fees predating 2016, as well as any protective advances made by Democracy for taxes, insurance, or other third-party expenses.

The formal calculations tell a different and consistent story. Democracy's settlement payoff, the statement of debt filed in the foreclosure action, and its proof of claim in this case each

apply the same provisions of the Loan Documents to the same payment history. The Debtor's assertion of inconsistency depends entirely upon comparing those formal calculations to preliminary and informal estimates exchanged among long time colleagues that neither accounted for all amounts due nor purported to state the amount Democracy would accept in satisfaction of the Loan. Once like is compared with like, the alleged inconsistency disappears.

## III.
## CONCLUSION

The Court should overrule the Claim Objection.

Respectfully submitted,

*/s/ Keith M. Lusby*
James T. Heidelbach (Bar No. 07715)
Keith M. Lusby (Bar No. 05596)
Gebhardt and Smith LLP
One South Street, Suite 2200
Baltimore, Maryland 21202
(410) 385-5028
klusby@gebsmith.com

*Counsel to Democracy Capital Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of July, 2026, I electronically filed the foregoing *Pre-Trial Brief* via CM/ECF, which will send notice of the filing to the following counsel of record:

Justin Philip Fasano jfasano@mhlawyers.com,
jfasano@ecf.courtdrive.com,
tmackey@mhlawyers.com,
mevans@mhlawyers.com,
cmartin@mhlawyers.com,
Fasano.JustinR92003@notify.bestcase.com

Kevin R. Feig kfeig@mhlawyers.com,
kfeig@ecf.courtdrive.com,
jnesse@mhlawyers.com,
cmartin@mhlawyers.com

James Taylor Heidelbach jheid@gebsmith.com

Nicole C. Kenworthy bdept@mrrlaw.net

Keith M. Lusby klusby@gebsmith.com

Stephen A. Metz smetz@offitkurman.com,
MD71@ecfcbis.com,
lydia.yale@offitkurman.com

L. Jeanette Rice Jeanette.Rice@usdoj.gov,
USTPRegion04.GB.ECF@USDOJ.GOV

US Trustee - Greenbelt USTPRegion04.GB.ECF@USDOJ.GOV

Maurice Belmont VerStandig mac@mbvesq.com,
lisa@mbvesq.com,
mahlon@dcbankruptcy.com,
mac@dcbankruptcy.com,
verstandig.mauricer104982@notify.bestcase.com,
verstandiglaw@recap.email

/s/ Keith M. Lusby
Keith M. Lusby