**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

In re

OB LLC

    Reorganized Debtor.

_____/

Case No. 25-20897-MCR

Chapter 11

**<u>PRETRIAL BRIEF OF OB LLC</u>**

Comes now OB LLC ("OB" or the "Debtor"), pursuant to the scheduling order in this matter, ECF No. 67, and the extension of certain deadlines set forth therein, ECF No. 89, and furnishes this pretrial brief in connection with the Debtor's objection (the "Objection"), ECF No. 64, to the claim (the "Claim") of Democracy Capital Corporation ("DCC"):

## I.    Introduction

In computing the amount of the Claim, DCC asks this Honorable Court to accept a set of calculations materially different than those previously produced by DCC and its predecessor in interest. It is not that DCC seeks to alter the laws of mathematics—all parties assuredly agree on those. Nor is it even that DCC seeks to suggest a different set of historic payment dates or amounts—remarkably, all parties also agree on those. It is, rather, that DCC asks the legal implications of agreed-upon historical events be viewed differently now than before.

To make this argument plausible, DCC must accomplish two things that are neither credible nor viable. First, DCC must urge—against the weight of centuries-old law—that any perceptive ambiguities in a promissory note ought to be construed in favor of the drafting party. And, second, DCC must urge that its own chairman and other agents were wrong—on multiple occasions—in presenting payoff figures that are actually wholly appropriate when one juxtaposes agreed facts to a plain reading of applicable contractual clauses.

To be sure, there is the question of whether or not DCC is estopped from now changing the payoff figure suggested by its chairman via text message in 2023. The Debtor believes all of the elements of estoppel to be present and has argued them in the Objection. But the issue is also somewhat moot for the very simple reason that a plain reading of applicable loan documents, coupled with a plain application of the agreed-upon loan history, well supports the validity of the payoff figure furnished in 2023. The Debtor is not asking this Honorable Court to hold an arithmetic error against DCC; the Debtor is asking this Honorable Court to recognize that DCC was very much correct in 2023 and ought to be estopped from urging otherwise today.

For these reasons, and as extrapolated upon *infra*, it is respectfully urged the Objection be sustained.

## II.    The Numbers are Agreed Upon

Attached to this memorandum as Exhibit A is a payment history for the at-issue loan.[1] The parties agree on the date—and amount—of every single distribution by the lender and on the date—and amount—of every single payment by the borrower. The parties also agree on the applicable interest rates under the loan documents. From origination until August 1, 2014, the loan incurred interest at the rate of 6% per annum. Thereafter, interest was at the rate of 5% per annum. Default interest, when applicable, is an additional 3% per annum.

Again, there does not appear to be any dispute as to any of the foregoing items. The parties agree how much was loaned, how much was later extended as "lender advances," how much was repaid, what interest rates governed, and the dates on which everything occurred.

---

[1] The Debtor is generally refraining from appending other exhibits to this brief, insofar as all trial exhibits are being separately uploaded of even date herewith.

The only dispute, it seems, concerns how and when to apply certain default figures—whether in the form of default interest, late fees, or maturity default penalties. And OB sets forth, below, a relatively modest proposal: those figures ought to be charged in the same manner in which they were historically shown to be charged by DCC and the note's prior holder, which also happens to be the most sensible manner in which to charge those figures.

### III.    DCC Cannot Charge a Maturity Default—Let Alone Two Maturity Defaults

There are various differences between the payoff sums proposed by Debtor and DCC. One of the most pronounced of the differences centers on the inclusion, *vel non*, of a maturity default penalty. The Debtor maintains DCC is not entitled to charge such a penalty at all. DCC, somehow, maintains it is entitled to charge this penalty twice.

Unsurprisingly, the evidence adduced at trial will show the promissory note and related loan documents to have all been drafted by the bank that originated the loan. Under Maryland law, any ambiguities therein are accordingly to be construed against the interest of that bank and, as here, the assignee(s) of the promissory note:

> . . . ambiguous language in a contract that is not clarified by extrinsic evidence or interpretive aids is construed against a party to the contract when that party drafted the language in question—a canon of construction sometimes referred to by the Latin phrase *contra proferentem* ("against the offeror"). That canon of construction is based on elementary notions of fairness—that the drafting party was responsible for including the particular language in the contract and presumably had the greater opportunity to clarify the language in its favor, if that was the parties' intent, or at least to protect its own interests from a lack of clarity. It is also meant to discourage the drafter from including ambiguous language in order "to induce another to contract with him on the supposition that the words mean one thing while he hopes the court will adopt a construction by which they will mean another thing more to his advantage."

*Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 97 (Md. 2021) (citing Williston on Contracts (4th ed. & 2021 update), § 32.12; Black's Law Dictionary (9th ed. 2009) at 377; Restatement (Second) of Contracts §206, Comment a; quoting *Owens v. Graetzel*, 126 A. 224 (Md. 1924)). *See*

*also Truck Ins. Exch. v. Marks Rentals, Inc.*, 418 A.2d 1187, 1191 (Md. 1980) (". . . it is a sound principle of contract construction that where one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against that party.") (citing *National Grange Mut. Ins. v. Pinkney,* 399 A.2d 877 (Md. 1979); *Aragona v. St. Paul Fire & Mar. Ins.,* 378 A.2d 1346 (Md. 1977); *McKoy v. Aetna Cas. & Sur. Co.,* 374 A.2d 1170 (Md. 1977); *Ebert v. Millers Fire Ins. Co.*, 155 A.2d 484 (Md. 1959)); *Mansell v. Toys "R" Us, Inc.*, 673 F. Supp. 2d 407, 415 (D. Md. 2009) ("It is well-established in Maryland that where there is an ambiguity in a document, that language is to be strictly construed against the party that drafted it because the drafter had the 'better opportunity to understand and explain his meaning.'") (quoting *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 596 A.2d 1069, 1075 (Md. 1991)); *Nationstar Mortg. LLC v. Kemp*, 258 A.3d 296, 311 (2021) (discussing "the well-accepted principle that an assignee succeeded to the rights and obligations of its assignor with respect to the loan").

Instantly, the promissory note provides, *inter alia*, "[i]f a payment is 15 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $2.00, whichever is greater."

The question is whether a maturity payment is a "regularly scheduled payment." The Debtor urges such to not be the case, since a "regular" payment is reasonably interpreted as one made on an ordinary and, ergo, "regular" basis (*i.e.*, monthly), whereas the making of a maturity payment is an innately extraordinary and, ergo, *irregular* occurrence (*i.e.*, being only made once).

Remarkably, DCC not only suggests a maturity payment to be a "regularly scheduled payment" but, with some degree of chutzpah, equally urges the late fee correlative to maturity to be chargeable twice. Under DCC's theory of this case, when OB failed to pay the note at maturity,

a default penalty—calculated from the full sum due—was assessed. When OB then negotiated an extension of the maturity date, DCC theorizes the old default penalty remained and, at that new maturity date, a *second* maturity penalty was assessed.

The amounts here are material. DCC is urging the first default penalty to have been in the amount of $127,071.92 and charged on May 1, 2014. DCC is then urging a second default penalty of $102,466.92 to have accrued on May 1, 2018. Taken together, these penalties total $229,538.84. DCC is not entitled to collect either of these sums, much less both.

## IV.     The Lender's Own Records Support OB's Calculations

There is an easy well to confirm that not even DCC's predecessor believed a penalty could be charged at the loan's maturity: the loan payment records of Congressional Bank (successor to American Bank) do not reflect any maturity default being charged on May 1, 2014 (or any other date). The records show plenty of late charges being applied to the payment history. But not once do the records—which run through February 2016—show a maturity default being charged.

Of perhaps greater import, though, there is another area where DCC's predecessor's loan records deviate from what DCC is now urging: the assessment of default interest. The evidence adduced at trial will show a default was never declared under the loan and DCC never exercised its default remedy of accelerating maturity of the debt. The Debtor, accordingly, asserts that default interest ought to have commenced accruing when the note was not paid at maturity in March 2018. Yet DCC has seemingly gone back and decided to objectively contradict its own predecessor's records, suggesting default interest began accruing in November 2012. The difference is approximately $366,250.00.

To be sure: OB agrees that default interest should have commenced accruing when the loan was not paid at maturity. The loan is very precise in noting, *inter alia*, "[u]pon default, **including**

5

**failure to pay upon final maturity**, the interest rate on this Note shall be increased by adding an additional 3.000 percentage point margin. . ." (emphasis added). But nowhere does the note suggest the missing of a regularly monthly payment ought to give rise to such a penalty, with an entirely different portion of the note governing the lender's rights upon the occurrence of such an occurrence: "Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, immediately due and payable, and then Borrower will pay that amount."

If default interest could be assessed commencing upon the occurrence of *any* minor default—including a regular monthly payment being so much as a day tardy—and then remain in place for the life of the loan, such would have enormous repercussions. This is exactly what DCC urges: one late payment and the interest rate irrevocably increases by 3%, even once the late payment is made and clears. Yet, under this construction, the foregoing verbiage—"including failure to pay upon final maturity"—is both deceptive and surplusage.

The language is deceptive insofar as a failure to timely make a monthly payment is assuredly a far milder occurrence than a failure to pay at maturity. Still, DCC urges the two events should be all-but-conflated, with a regular payment coming a single day late having the same repercussion as the loan not being paid at maturity. A reasonable reader would not see the chosen anecdote of a failure to pay at maturity and surmise such to also mean a failure to timely make a regular monthly payment.

Yet the language is also surplusage if DCC's reading is embraced. If *any* default—even a failure to timely make a payment, which is promptly cured—were sufficient to invite the permanent imposition of default interest, the words "including failure to pay at maturity" would be wholly superfluous. Case law disfavors such a reading of the note. *See, e.g.*, *Willow Constr.,*

*LLC v. John R. Crocker Co.*, 2021 Md. App. LEXIS 954, at *13 (Md. App. Oct. 28, 2021) (". . . contract interpretation can be analogized to statutory interpretation in the sense that 'no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory.' Contracts shall be interpreted to avoid surplusage, if possible.") (quoting *Orkin v. Jacobson*, 332 A.2d 901 (Md. 1975) (citing *Thomas v. Police Comm'r*, 127 A.2d 625 (Md. 1956)); citing *Jeffrey Sneider-Maryland, Inc. v. LaVay*, 345 A.2d 79 (Md. App. 1975)).

The Congressional Bank payment history does not show default interest being applied before the maturity date. The evidence adduced at trial will show neither American Bank, nor Congressional Bank, nor DCC, ever accelerated the debt before maturity. Nor will the evidence show any default notices ever being sent. Yet now, more than 13 years after the fact, DCC is suggesting that the noteholder had the right to commence charging default interest—and somehow did so, despite loan records showing otherwise—the very first time a payment was slightly late.

Critically, OB *did* make the November 2012 monthly payment. And OB acknowledges that since that payment was made late, a 5% late fee (calculated against the monthly payment amount) should be added to the debt. But whereas DCC suggests that single payment being slightly late forever altered the interest rate under the note, OB urges such is not a fair reading of the document and, moreover, is a reading directly and facially belied by the very loan payment history maintained by DCC's predecessor.

## V.     The Text Message Was Right

The Debtor has pointed—throughout this case—to a text message, from the chairman of DCC to OB's manager, in August 2023, in which DCC observes the amount due under the note to be "Approx 2.7." And OB has urged, in turn, that DCC ought to be estopped from now asserting any other sum to have been due and owing in August 2023, since OB relied upon this calculation

in various ways. But, and somewhat critically, this is not a game of "gottcha" where OB is trying to pin DCC to some historic error: $2.7 million was very much the correct payoff number in August 2023.

Or, more precisely, $2,711,280.19 (a number that surely meets the criteria of being "Approx. 2.7") was the correct payoff on August 1, 2023. That figure includes $24,461.08 in late fees (being added for every month when a payment was late) and $324,666.67 in default interest (having commenced accruing at loan maturity since the loan was not paid at maturity).

OB does not dispute owing those $24,461.08 in late fees. Nor does OB dispute owing that $324,666.67 in default interest (a fairly significant sum). Those are charges fairly made under the loan documents, properly due from OB. And those were presumably factored into DCC's figure in August 2023, alongside various other items (lender advances, regular interest, principal).

The evidence adduced at trial, however, will show that DCC was not content merely collecting its principal, interest, lender advances, late fees, and default interest. Once DCC realized there was more money to be made—and the property securing the loan was about to be sold for $3.5 million—DCC suddenly revisited its numbers and, quite conveniently, came up with a new payoff figure that was just a hair less than $3.5 million.

This was disingenuous and destructive at the time, giving rise to the estoppel argument raised in the Objection. And this is just as disingenuous today. The fair calculation of the debt was exactly as DCC indicated in August 2023 and that calculation ought to be honored (with interest for the ensuing time period) today.

## VI.    DCC's Inconsistencies Matter

Finally, the evidence adduced at trial will show the text message from August 2023 and the proof of claim in this case are not the only payoff figures provided over time. As noted *supra*,

8

there is a loan payment history that has been retrieved from DCC's predecessor holder of the note, with that history showing default interest was absolutely not charged prior to the note's maturity. And there is, too, the calculation of Jim Plack—produced with the aid of other DCC agents—from August 2024. That calculation shows an entirely different sum—somewhere in the middle of the numbers presently being urged by the respective parties—having been due and owing at the time.

Discussed above is the well settled principle that contract ambiguities are construed against the interest of a drafting party. *Mansell*, 673 F. Supp. 2d at 415. But also included above is the rationale underlying this hornbook tenet of law: a non-drafting party ought not be at the mercy of changing or unexpected interpretations of a contract. *Timm*, 255 A.3d at 97.

There is a plain construction of the note that supports just over $2.7 million having been due and owing in August 2023 and that supports $3,174,025.93 having been due on March 13, 2026 when the property was sold and the loan was paid off. This is a simple, reasonable construction. This appears to be the construction used by DCC's predecessor holder of the note. This appears to be the construction used by DCC's chairman in August 2023. And this is the construction that ought to be used by this Honorable Court—allowing otherwise would be punishing OB, the non-drafting party, for ambiguities the lender allowed to become imbedded in the promissory note and related loan documents.

Respectfully submitted,

Dated: July 24, 2026      By:     /s/ Maurice B. VerStandig
                               Maurice B. VerStandig, Esq.
                               Bar No. MD18071
                               The VerStandig Law Firm, LLC
                               9812 Falls Road, #114-160
                               Potomac, Maryland 20854
                               Phone: (301) 444-4600
                               mac@mbvesq.com
                               *Counsel for the Reorganized Debtor*

9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of July 2026, a copy of the foregoing was served electronically upon filing via the ECF system on all counsel who have entered an appearance herein, including:

- Justin Philip Fasano    jfasano@mhlawyers.com, jfasano@ecf.courtdrive.com;tmackey@mhlawyers.com;mevans@mhlawyers.com;cmartin@mhlawyers.com;Fasano.JustinR92003@notify.bestcase.com
- James Taylor Heidelbach    jheid@gebsmith.com
- Nicole C. Kenworthy    bdept@mrrlaw.net
- Keith M. Lusby    klusby@gebsmith.com
- Stephen A. Metz    smetz@offitkurman.com, MD71@ecfcbis.com;lydia.yale@offitkurman.com
- L. Jeanette Rice    Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- US Trustee - Greenbelt    USTPRegion04.GB.ECF@USDOJ.GOV
- Maurice Belmont VerStandig    mac@mbvesq.com, lisa@mbvesq.com;mahlon@dcbankruptcy.com;mac@dcbankruptcy.com;verstandig.mauricer104982@notify.bestcase.com;verstandiglaw@recap.email

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.

10