IN THE UNITED FOR STATES THE DISTRICT UNITED STATES OF MARYLAND BANKRUPTCY COURT
(Greenbelt Division)

____________________________

ERIK BOLOG, CASE NO. 25-20897

Plaintiff,

v.

OB LLC

Defendant.

____________________________/

DEPOSITION OF ERIK BOLOG
Via Videoconference

DATE: July 16, 2026 / Time: 9:49 a.m.

Reported by: Victoria Simonyak, CER

DCC21

2

APPEARANCES

On behalf of the Plaintiffs:

MAURICE VERSTANDIG, ESQ.
THE VERSTANDIG LAW FIRM, LLC
9812 Falls Road #114-160
Potomac, MD 20854
(301)444-4600
mac@mbvesq.com

On behalf of the Defendants:

KEITH M. LUSBY, ESQ.
GEBHARDT & SMITH LLP
One South Street, Suite 2200
Baltimore, MD 21202
(410)385-5028
klusby@gebsmith.com

3

I N D E X


| | |
|---|---|
| Proceedings | 5 |
| ERIK BOLOG | |
| Examination by Mr. Lusby | 6 |


E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of deposition | 6 |
| 2 | Debtors Responses to Interrogatories | 19 |
| 3 | Text Exchanges | 35 |
| 4 | Werrlein Properties Purchase Agreement | 40 |
| 5 | Text Exchanges | 42 |
| 6 | Company Emails Resettlement | 53 |
| 7 | Plaque Provided Loan Summary | 58 |
| 8 | Congressional History | 62 |
| 9 | Debtors Calculation of Payoff | 64 |
| 10 | CIT1 | 81 |
| 11 | CIT2 | 85 |

4

P R O C E E D I N G S

(9:49 a.m.)

THE REPORTER: All right. Good morning. We are on the record. The time is 9:49 a.m. My name is Victoria Simonyak and I am your court reporter today. The date is July 16th, 2026. Would counsel present please enter your appearance for the record?

MR. LUSBY: Keith Lusby for Democracy Capital Corporation.

MR. VERSTANDIG: Maurice VerStandig for OB, LLC, reorganized debtor.

THE REPORTER: All right, thank you. And Mr. Erik Bolog, would you please raise your right hand to be sworn. Do you swear or affirm that the testimony you give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE REPORTER: Thank you, Counsel, you may proceed.

ERIK BOLOG,

the witness was called to testify, and provided the following testimony:

EXAMINATION

BY MR. LUSBY:

5

Q. Mr. Bolog, good morning. Have you been deposed before?

**A. I have.**

Q. Okay. How many times?

**A. Less than five, but I couldn't give you a precise amount.**

Q. Okay. And you are or were a practicing attorney, correct?

**A. Yeah, I know all the rules. You don't have to take any time to waste on that.**

Q. Okay, excellent.

**A. I've taken a thousand depositions.**

MR. VERSTANDIG: For the record, he's being literal.

BY MR. LUSBY:

Q. Why don't we -- I am going to mark the notice of deposition that I've already placed in the chat as Exhibit 1. I will pull that up on screen here. Bear with me for a minute. Sorry, my computer's moving a little slow today.

All right, can you guys see the notice of deposition?

(Exhibit 1, Notice of Deposition, marked for identification.)

MR. VERSTANDIG: No. We have your web browser.

14

**there's a--**
Q. Mr. Bolog, I don't mean to interrupt. My questions are simply whether you prepared to discuss these topics generally --
**A. Yes.**
Q. Today --
**A. So on five, yes.**
Q. Okay. We'll spend lots of time talking about the specifics. I'm really just trying to get--
**A. Okay--**
Q. -- what you prepared and what you did to prepare for today's corporate designee deposition. Are you prepared to testify as to area of inquiry number seven today?
**A. You skipped six.**
Q. I did, but we'll just go to seven. Since --
**A. I see. The text message, if that is defined as the text chain between the chairman of Democracy and myself, yes.**
Q. Okay. And number six, you prepared to testify about that today?
**A. Yes.**
Q. All right, and what about number eight, which spans the top of page four and the bottom of page five? And for your reference, the proposed sale refers to the

15

initial July 2024 proposed sale to Werrlein.
**A. Yes.**
Q. Okay. And what about number nine? Are you prepared to testify about area of inquiry number nine?
**A. Yes.**
Q. Did you review the claim objection before testifying today?
**A. I have reviewed it.**
Q. Okay. What about number 10?
**A. Generally speaking, yes.**
Q. Okay.
MR. VERSTANDIG: Number 11 does assume a fact that is disputed, but that is a question of law, not a question of fact. Namely, whether or not the quote, unquote Pook's Hill Road property is collateral for the loan or not. And that's something that would be ascertained through the land records, not through Mr. Bolog. If we're talking about the undeveloped property in Prince George's County, I think we can all agree that is no longer collateral securing the loan, since that is no longer owned or controlled by the reorganized debtor.
BY MR. LUSBY:
Q. All right. Well, let's just, let me ask this, Mr. Bolog, are you prepared to testify about any of the

16

collateral that may or may not have secured the loan?
**A. To the best of my ability, sure.**
Q. Okay. What about area of inquiry number 12?
**A. Generally speaking, yes. I think almost essentially all of that was done in concert with counsel. And so I think most of that topic will be we'll have some privilege issues to discuss when we get there, but generally speaking, yes.**
Q. All right. And 13?
**A. Yes.**
Q. Okay.
**A. Well, I mean, objections to written discovery is, -- I'm going to leave that to the lawyers, but the factual basis, I'm happy to answer questions on.**
Q. Okay. All right, let's talk about OB a little bit. Who are OB's members?
**A. I believe it is Maurice Louis Offen.**
Q. Has that always been the case?
**A. I think the answer is yes. I'm -- the only thing I'm struggling with is sometimes Dr. Offen would include his children or entities that his children had ownership interest in in his investments. And I'm sure that Dr. Offen was the owner. He's, I think the -- I think he was the 100 percent equity owner in OB, LLC, and then I was a member, but for administrative purposes only. I have no -**

17

**- I have no ownership, no equitable ownership, no equity stake in any of this.**
Q. So when you say you were a member for administrative purposes only, can you elaborate on that a little more?
**A. So, generally speaking, I assist Dr. Offen with his world and circle his orbit with him. assume what must have happened, at some point, was that when OB was formed, the law firm that formed it back in 2012 would have made a suggestion as to the structure and that is how it is that I am a member of it for administrative purposes, but not with any equitable ownership.**
Q. Your testimony is you are a member of the limited liability company but own no equity?
**A. Yes, that is my understanding, has always been my understanding.**
Q. Does OB have an operating agreement?
**A. I would assume it has an operating agreement, but I did not review any operating agreements in preparation for today, and I have not seen an operating agreement in my memory. I do not recall seeing it.**
Q. Okay. Is OB, LLC managed by its members or does it have a manager?
**A. I believe it is managed by its manager, which is me.**

calling you Mr. Bolog, but Off the record., I'd be happy to call you Erik.

**A. I'm going to keep calling you Keith.**

Q. Fair enough. Okay, so Dr. Offen's investment in the property, you testified about debt service, right?

**A. I didn't use the word debt service.**

Q. Okay. You talked about payments on the loan made by him or entities affiliated by him, yes?

**A. Yes. And entities affiliated with the then-chairman of Democracy. So they owned real estate together, okay.**

Q. Understood. I'm just trying to understand what Dr. Offen's monetary investment in the property is. And one of the things you testified about is either entities he had some interest in or himself making the payments. Is that right?

**A. It was a million dollars and change, exclusive the $3.5 million payment that was made either to American Bank or to Democracy between 2012, and the bankruptcy plan being confirmed in the sale going through.**

Q. Okay. And I just -- I just want to understand, see those payments is the debtor's testimony came from other entities that Dr. Offen had some interest in?

**A. So those payments -- and I'd have to check with his accountants to see how they allocated -- so I don't**



**know if they allocated as those loans to OB but I don't believe the payments -- I don't believe the payments ever flushed through an OB account to either American or Democracy.**

**Now, I may be wrong on that, but I don't think I am. But I think for tax purposes, all of those payments were allocated as loans by Offen to OB since they were Offen's post-tax dollars that were being used to pay down the OB debt, relating to this particular loan.**

Q. Okay. Other than payments of the, I'm calling it debt service, but the American Bank, now Democracy loan, did Dr. Offen have any other economic contributions to the property or OB?

**A. I'm sure he did. You know, for instance, somebody had to pay for the tax returns every year. Many years that there would be the real estate taxes paid, Dr. Offen would fund those in some years out of pocket. It may have come from him, his personal account. It may have come from one of his entities. Dr. Offen would have to pay when we went and tried to market it. When we had any type of legal issues related to the property, Dr. Offen would fund all of that.**

**And so Dr. Offen was either directly or indirectly funding all of whatever loan payments were made and any other costs of maintaining the property between 2012 and**



**2026, with the understanding that he didn't fund all of those, and there were some where Democracy or American, but then American would have gotten repaid where American over Democracy funded certain aspects, such as real estate taxes, if Dr. Offen wasn't in the position to do it.**

**So the loan was a -- we'll just call it an interesting loan. And when Congressional Bank did its diligence to make a determination as to which assets it was going to accept from American, part of the merger and which assets it wasn't, this was one that they thought was irregular enough that they didn't -- that Congressional didn't want to own it.**

**So Democracy kept this particular loan.**

Q. How did the debtor come into contact with Werrlein Properties?

**A. I received a call, I think, from either Mr. Werrlein, or the person who became this -- their deal manager, Project Manager Karl Granzow. I believe that's the case, but, well, that's the best of my recollection.**

Q. Understood. Do you recall approximately when that first inquiry would have been made?

**A. I know we spoke, I think they had reached out, I think, to Jim Plaque sometime in 2019 or 2020. And I think Jim put me in touch with them. And thereafter, that didn't, if I recall correctly, didn't really go anywhere.**



**And then they either reached out again through Jim, or still had my contact information and reached out for me in 2023.**

Q. Now, when they reached out to you in 2023, did they make an offer on the property?

**A. We started negotiating a price, and I don't recall when it first got memorialized in the form of a contract or even a letter of intent, but there did come a point in time where they had -- they had a general ballpark number. And that's when I reached out for Democracy to find out what the payoff was. So I could see, and I knew how much Offen had already lost in this deal.**

Q. How much was that at the time?

**A. A million dollars.**

Q. Okay.

**A. And so --**

Q. I'm sorry, I didn't mean to interrupt. So then Werrlein reaches back out sometime in '23, correct?

**A. Best of my recollection, sometime in the spring to summer of 2023.**

Q. Okay. And at that point, had you started discussing pricing terms?

**A. I think when they initially reached out, they had a number in mind which was neither here nor there to me,**

38

**A. Yes.**

Q. Okay.

**A. And likely, very likely, just the way Democracy's chairman works is he would have called me, and because he's the inquisitive type and he'd want to know what's going on and why are we talking about this. And --**

Q. So do you recall a specific conversation?

**A. Keith, in fairness, I do have a general recollection that I spoke to him about this, but I can't possibly, for you, pinpoint a day, and my phone records wouldn't help because I talked to him about lots of things on different days.**

Q. Okay.

**A. And so --**

Q. I think we're going far afield. I'm just trying to get to the timeline of the negotiation.

So you get the 2.7, and then your testimony was the goal was to negotiate to mitigate Dr. Offen's losses, too, correct?

**A. Yup. Yes, sir.**

Q. Okay. And the prior testimony was that his losses were, at that point, approximately $1,000,000. Is that right?

**A. That's what my understanding was.**

Q. Okay. So what was the purchase price that OB was able to negotiate with Werrlein?

39

**A. I believe the first contract was three and a half million.**

Q. Okay.

**A. But it gave them 50 -- it gave them extensions, if I recall correctly. At $50,000 a pop, I don't remember how many days they'd get, so 3.5 was if they closed on time, if they needed more time, for whatever reasons, they had put up a sizable deposit. And we were convinced that they were going to move forward, but they could buy more time to get to closing. They -- y recollection is they bought one extension.**

**So the contract purchase price that we went to the initial closing with was three million, five-fifty, if I recall correctly. Now, I was also -- we were represented by counsel for the transaction, and they would have been dealing with the specifics of it, but, so what you've put up here, I guess, is Exhibit four is at least --**

Q. Hold on. Let's slow down, Mr. Bolog. I just want to mark everything and keep a clean record. So I've, -- I've placed in the chat, put up on my screen a document called Werrlein Properties Purchase and Sale Agreement. We'll mark the purchase agreement that you were just testifying about with Werrlein Properties.

(Exhibit 4, Purchase and Sale Agreement, marked for identification.)

40

**A. Again, you're showing me the first page, I assume it is. I don't have any reason to think you're not showing me the actual document. But scrolling at this speed is -- well, keep going. Let's just get to signature pages.**

Q. That's okay. Let's do this. So this was, I see here it says that the purchase price is $3.5 million, correct?

**A. Yes.**

Q. And that was the negotiation you just described with Werrlein and getting to that number, yes?

**A. Right. And then if you look below it -- and oh, there was purchase price adjustments for 30-day extensions. And so --**

Q. Okay. And that was the other term you had just referenced as having negotiated?

**A. Well, I'm not sure if I negotiated it or -- I certainly approved it.**

Q. Okay. But, nobody else on behalf of OB was negotiating this at the time?

**A. No, that's untrue. We had -- OB had hired counsel that was representing -- that was representing OB in relation to the contract negotiations with --**

Q. Counsel wasn't taking direction from anybody other than you?

41

**A. Counsel was only taking direction from me.**

Q. Okay. All right, so the, if I take your testimony correctly, then this -- if the payoff was two, seven, and the purchase price was three, five, the goal was to recover roughly $800,000 of Dr. Offen's investment?

**A. The goal was for Dr. Offen not to lose money. The reality was that was, at the time, the highest I could get Werrlein. And they were the only purchaser we were aware of that had any interest in buying the property.**

Q. Okay, but it's a debtor's testimony. You were working off the 2.7 figure to get there.

**A. I was using the 2.7 number to help me gauge how big of a loss Dr. Offen was going to suffer.**

Q. And at that point, that's when you agreed to the 3.55, or 3.5, I should say.

**A. I agreed to the 3.5 when I hit a wall, that I wasn't getting anywhere past it other than the extension fees, the $50,000 extension fees.**

Q. Let's put -- I'm going to mark what I just placed in the chat as Exhibit number 5.

(Exhibit 5, Document, marked for identification.)

**A. I don't, I don't think that's what, what's on the screen, I don't think is an exhibit.**

MR. VERSTANDIG: You shared your browser again.

46

up. All right, and for the -- for the record, I put the -- the 2.7 million text on the screen.
All right. Do you see here where it says, "approx. 2.7"?
**A. Yes.**
Q. Okay, and that text came above here. Do you see where it says Tuesday, August 29th?
**A. Yes.**
Q. Okay. So that text message that you received from Mr. Schuble would have come on the 29th.
**A. The text -- but if you scroll up, go back up. What you see there is on Friday, August 25th, I'm hitting them again, "did you figure out the payoff so I can move this contract forward?" I had spoken to Joe, and he had given me the rough number of 2.5 to 2.7, 2.8 area before I was zeroing in on that number. So Joe and I had spoken.**
Q. So it's the debtor's testimony today that before this text message, Democracy had provided a different number than the 2.7 million before this.
**A. My recollection is Junior and I had spoken, and he had given me a reach, but he wanted -- he did not want me until he had a chance to speak with Doug, his comptroller. He did not want me to rely on that, but I had a ballpark in my head from him on that. Then a few days later, I followed up, and then he said he was having**

47

**Doug calculate it. And then Doug needed to purportedly ask somebody named Amanda, and then he got back to me with the 2.7, just confirming the range that he had given me.**
Q. Okay. So then the debtor did not rely on the 2.7 text to negotiate the purchase price, right?
**A. No, that's -- that's untrue. This was still just negotiating. I had a range, then he firmed it up. I used his range, and then I saw the number in the text. I knew then I could go at that number and try to recoup as much as I could for Dr. Offen.**
Q. How did you make an offer based on a text message that didn't occur for another week?
**A. Because I had gotten--**
MR. VERSTANDIG: Hold on. I get to object, and then you get to answer.
THE WITNESS: Okay.
MR. VERSTANDIG: I'll object to the form of the question. The witness may answer.
THE WITNESS: Okay. Joe had given me a range. I had the range. I was doing two things at the same time. I was moving along a negotiation based upon an estimate, but waiting for a confirmation from him before I would have ever gone to Dr. Offen for his authority, his ultimate authority, to make any --
BY MR. LUSBY:

48

Q. So this testimony that when you sent this text message on August 22nd, you didn't have authority from Dr. Offen yet?
MR. VERSTANDIG: Object to the form of the question.
THE WITNESS: Right. So the answer is I have always have general authority, but I would -- like everything else I would do for Dr. Offen or any other family office I do work for, even though I get authority to do things, I go back for final blessing because it's their money, not mine.
BY MR. LUSBY:
Q. I'm still trying to understand. Let's take it in pieces. The text message the debtor claims to have relied upon in formulating the 3.5 number came on August 29th, correct?
**A. I think we've established that the text message certainly relied upon. But the dates are whatever I assume these dates are. I have no reason to quibble with the dates.**
Q. Okay. So my question is really, how did the debtor rely on a text message sent on August 29th to formulate an offer made on August 23rd?
**A. Because the 2.7 million dollar text was to a conversation I had before that where I had arranged from**

49

**the chairman that was somewhere in the 2.5 to 2.8 range.**
Q. So it's the debtor's position today, then, that the reliance was actually on Mr. Schuble's prior oral representations?
**A. Now, see, you're looking at negotiations, okay. I didn't enter into a contract until well after I had these oral data points. In part, I had a 2.7 that we ultimately relied on when we entered into the contract. I had a range that I was negotiating off of.**
Q. You know how soon before tax conversations with Mr. Schuble would have happened?
**A. I would assume it would have been somewhere in that immediate area, because if you look at the language of our text, it was on that 25th. It was, have you had a chance yet to confirm or speak with Doug about this? And so that would, at least, suggest to me it would have been within a week or two. But that's -- that's best recollection that. I'm not looking at anything that would tell me that definitively.**
MR. VERSTANDIG: Counsel, when you're at a breaking point, I want to take a couple minutes, but it's not a matter of urgency.
MR. LUSBY: Okay. Yeah, just give me probably another two, three minutes.
BY MR. LUSBY:

58

Democracy. At the bankruptcy confirmation hearing, you argued, or did with, whether or not that is true -- I have not done anything to verify my belief that he's the president of Democracy. But Jim, the things I know is that Jim was the president and CEO of American Bank, that Jim ran Democracy after American Bank merger. And it was my understanding he was president and is a significant major owner of Democracy, of the shares of Democracy Bank. And so that's my understanding of his role. I do know that he has been instrumentally involved in managing the Democracy assets that it maintained after the Congressional Bank merger and has been involved in the management and collection of all of those loans, including the OB loan. That's my understanding.

BY MR. LUSBY:

Q. When the debtor didn't close in July of 2024, did Werrlein take any legal action?

**A. I have no idea what Werrlein did. If you're asking me whether or not Werrlein took legal action, that's slightly different. And the answer is I believe there were communications with OB's Counsel about where things go from there. Those -- that information I would have gotten from Scott Taylor. And so all of that, I think we don't have to waste a lot of time on whether or**

59

**not that's privileged. I know that there did come a point in time where I heard from Tim Maloney, who is a PG county litigator, who I've known for many, many years, who was representing Werrlein about where things stood and moving it forward and get it closed with their you know, issue that they had spent, Werrlein purportedly had spent hundreds and hundreds of thousands of dollars in diligence costs and had a contract and expected to close on the contract.**

Q. Did Werrlein sue the debtor at any point?

**A. Not that I'm aware of.**

Q. The debtor did ultimately close under this contract, correct?

**A. No.**

Q. Why do you say no?

**A. Because it's the opposite of yes.**

Q. Okay, elaborate then on why the answer to the question is no. What contract did it close under?

**A. There was an amendment to the contract.**

Q. Okay.

**A. And it closed under that amended contract pursuant to a bankruptcy sale. So I'm, you guys are bankruptcy guys and I respect the hell out of that, but I don't really understand a lot of it. So I know that there's -- there was an amended contract and then there**

60

**was a bankruptcy proceeding that led to the approval of a sale, but I don't know the technicalities as to was it the bankruptcy sale that sold the property or was it a contract. I just don't -- I don't have the technical expertise to answer that question.**

Q. Werrlein purchased the property, correct?

**A. That's totally my understanding. That, and I don't think it's Werrlein, but a Werrlein entity purchased the property.**

Q. For $4,000,000?

**A. I believe that to be accurate.**

Q. Okay. And at the time the debtor closed on that, the debtor understood democracy's contentions as to the payoff amount, correct?

MR. VERSTANDIG: Object to the form of the question. You may answer.

THE WITNESS: Yeah, I think I had seen Democracy's claim, so yes.

BY MR. LUSBY:

Q. All right, let's shift gears to the claim calculation. And this won't be nearly as long.

All right, I'm putting in the chat and marking as Exhibit 8 what I've identified as the -- what I've called the file name, Congressional History. And I will share my screen.

61

Mr. Bolog, do you recognize the document that I put up on the screen with the file name Congressional History?

(Exhibit 8, Congressional History, marked for identification.)

**A. Are you asking me if I recognize this document?**

Q. Yes.

**A. No.**

MR. VERSTANDIG: For the record, that it has the debtors bate stamps on it and was produced by the debtor or the reorganized debtor, I should say, as part of the discovery process.

BY MR. LUSBY:

Q. And you've never seen this document?

**A. Oh, I didn't say that. You asked me if I recognized it.**

Q. Okay, so why -- have you ever seen this document?

**A. I may have.**

Q. Okay.

**A. The thing that's throwing me off is this says Congressional Bank. Congressional Bank never owns this--**

Q. All right, let's try it this way --

MR. VERSTANDIG: Off the record for a second.

MR. LUSBY: We can go off.

(Off the record.)

(On the record.)

Q. Okay. Mr. Bolog, the payments were made on the loan primarily from where?

**A. Well, if you're saying for from 2012 to the last payment that was made, where did those funds come from? I can't do better than to tell you that the three and a half million came from the sale of the property. Other payments came from often related entities. And I can't be more specific than that with you.**

Q. Okay, so other than the Plaque provided spreadsheet, whatever was provided by Mr. Postal, what other records does the debtor have, with respect to payments made under the loan?

**A. I think --**

MR. VERSTANDIG: Hold on. Object to the form. Counsel, may I assume that you mean pre-confirmation?

MR. LUSBY: Pre-confirmation.

MR. VERSTANDIG: Thank you.

THE WITNESS: All right, I got confused based on the objection. Keith, can you re-ask the question?

BY MR. LUSBY:

Q. Sure. What -- are there any other records that OB has as to the calculation of the loan other than what was provided by Mr. Plaque and whatever was provided by Mr. Postal?

MR. VERSTANDIG: Object to the form.



Understanding the answers to be as to pre-confirmation payments, correct?

THE WITNESS: Right. So pre-confirmation payments, OB, itself doesn't have any other -- any of the documents. The Offen entities that made the payments would have those documents, but OB, itself, wouldn't have possession of those.

BY MR. LUSBY:

Q. So is it the debtor's position that the records in possession of its 100 percent owner and managing member are not records within OB's possession, custody and control?

**A. No, that's not, that's definitely not OB's position. OB's position is that you just asked a question of do we have -- does OB have records, and OB does not. OB, through Dr. Offen and through the chairman of Democracy, because they had shared entities, could try to find which of those entities made the particular payments. But I don't have that information, as I'm sitting here today.**

Q. Bear with me for a minute.

All right, let's pull up -- I'm going to pull back up the Debtors Interrogatory Responses, which we had previously marked.

All right, Mr. Bolog, do you see interrogatory number



20 there?

**A. Yeah, I can see that. Let me just read it.**

Q. So in that interrogatory, I had asked if the debtor contends that any of the dates of payments reflected in the loan history, which was defined to include the congressional history, identify such payment, state the date is correct, and state all facts supporting such contention. So when the debtor answered this question, did it review the loan history?

**A. To answer the question, the debtor must have reviewed the loan history.**

Q. Okay. Would anybody other than you have reviewed the loan history on behalf of the debtor?

**A. Oh, counsel.**

Q. Okay. And the only thing that was referenced here is that it did not include the application of the 3.5 million dollars, correct?

**A. That's what this answer says, yes.**

Q. And the debtor didn't raise any other disputes with respect to the loan history, correct?

**A. That appears to be correct.**

Q. And that is still the debtor's position today?

**A. Yes.**

Q. Okay. All right. I'm going to pull back up the debtors calculation of the payoff amount again.



**A. Okay.**

Q. All right. And for the record, Mr. Bolog, this is the -- what you and your counsel worked on as the, -- what you believe is the correct payoff amount? Is that right?

**A. Can you go down to the bottom?**

Q. Yeah, sorry. Let me clarify because I'm not -- this isn't trying to be a gotcha. There were two calculations presented. One, if you had, sort of, worked off the 2.7, and one if you didn't work off the 2.7. This, I believe, is the one that doesn't work off the 2.7, correct?

**A. I believe that to be correct.**

MR. VERSTANDIG: Hold on. Woah, woah, woah. Object to the form of the question. I think that actually misstates it, but there are two calculations, and the document speaks for itself as to what the delta in the two calculations is.

MR. LUSBY: Do I have it backwards? This was the -- off the $2.7 million number.

MR. VERSTANDIG: Give me a second.

MR. LUSBY: It was -- it would have been Exhibit D to the claim objection. And at least it says is not found to be binding. And then it says, see debtors calculation as D. So I don't think I